**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
CLAUDIA COJOCARU and NAOMI HABER,     :
                                                  :
                 Plaintiffs,     :     Civil Case No.:
                                                  :
          v.                   :
                                                  :     **COMPLAINT**
CITY UNIVERSITY OF NEW YORK d/b/a JOHN   :
JAY COLLEGE OF CRIMINAL JUSTICE, RIC    :
CURTIS, ANTHONY MARCUS, LEONARDO     :     **Jury Trial Demanded**
DOMINGUEZ and BARRY SPUNT, all in their  :
individual and professional capacities,       :
                                                  :
                 Defendants.     :
                                                  :
---------------------------------------------------------------X

Plaintiffs Claudia Cojocaru and Naomi Haber hereby allege as follows:

## PRELIMINARY STATEMENT

> **"You took away my worth, my privacy, my energy, my time,**
> **my safety, my intimacy, my confidence, my own voice . . .**
> **until now"** — **Anonymous**

1.    The John Jay College of Criminal Justice ("John Jay") holds itself out as an

institution that prepares students for careers in justice, law and law enforcement, and claims to

educate "**fierce advocates for justice**," and that it is a "**preeminent international leader in**

**educating for justice in its many dimensions**."[1]  John Jay students expect and are entitled to an

educational experience where these virtues are more than mere slogans, but actually embodied

by the institution, its leaders and its faculty.  Unfortunately, for Plaintiffs Claudia Cojocaru and

Naomi Haber, their educational environment at John Jay was a cesspool of sexism, misogyny,

sexual harassment and illegal drug use fueled by professors who used their positions of trust,

---

[1]    Available at: http://www.jjay.cuny.edu/ and http://www.jjay.cuny.edu/about-john-jay

seniority and inherent power-imbalance to prey upon female students' vulnerabilities and manipulate them to satiate their own sexual desires.

2.     During their undergraduate tenures at John Jay, Ms. Cojocaru and Ms. Haber were introduced and subsequently immersed into an exclusive and clandestine environment known as "The Swamp."  The Swamp was spearheaded by Defendant Ric Curtis – professor and former Interim Chair of the Sociology Department, and a supposed expert in drugs and sex trafficking – and the term denoted a place where he and other members of faculty would act openly hostile to the norms of law, ethics and morality.  In The Swamp, Mr. Curtis, together with Defendants Anthony Marcus, Leonardo Dominguez, Barry Spunt and others, degraded and dehumanized female colleagues and students, describing them using terms such as "**Cunts**," "**Bitches**," "**Stupid Bitches**," "**Lesbian Bitches**," "**Sluts**," "**Stupid Sluts**," "**Idiots**," "**Crazy**," "**Psychotic**," and describing those who alleged sexual assaults and rapes as "**a pathological liar**" and "**a slut who said that everyone raped her**."

3.     Mr. Curtis, Mr. Marcus and others used hypersexualized language to describe women (including both students many years their junior and their faculty peers), denigrated women based on their looks and openly discussed their sexual conquests over female students, including: "**I'd tap that [referring to students and faculty members]**," "**I would hit that if she wasn't so crazy [referring to a student]**," "**I would tap that if she hadn't gotten fat, now she looks like a dump [referring to a student]**," "**If I have another drink or two later, even [the student] will look good**," "**[Student's name] is crazy in bed**," and bragging that "**I fucked [another student] so hard that she vomited**."

4.     Mr. Curtis, Mr. Marcus, Mr. Dominguez and Mr. Spunt apparently believed they could operate entirely on their own skewed and twisted rules.  Among other rules that Mr. Curtis,

Mr. Marcus, Mr. Dominguez and Mr. Spunt routinely disregarded were Rule IV(D) of John Jay's "Policies and Procedures on Non-Discrimination and Sexual Harassment" and  Rule XIV(D) of John Jay's "Policy on Sexual Misconduct," both of which state the obvious:

"**intimate relationships**" between professors and students are "**inappropriate because of the unequal power dynamic between students and faculty members [and] [s]uch relationships necessarily involve issues of student vulnerability and have the potential for coercion [and] conflicts of interest or perceived conflicts of interest may arise**."  For those reasons, "**[F]aculty members and other employees are prohibited from engaging in intimate relationships with students for whom they have a professional responsibility**."

5.       In this alternate reality created by Mr. Curtis, Mr. Marcus, Mr. Dominguez, Mr. Spunt and the rest of their clique, the fact that there was a complete power imbalance between professor and student (very well known to these professors who study sexual relationships professionally) was discarded as irrelevant.  So too did Mr. Curtis, Mr. Marcus, Mr. Dominguez and Mr. Spunt swiftly ignore the fact that college students – who are often searching for their identities and experiencing new levels of individual freedom – look to professors as a source of trust, guidance and direction, and actively seek acceptance from them in their positions of authority.  Rather than accept the responsibility that their positions inherently require, Mr. Curtis, Mr. Marcus, Mr. Dominguez and Mr. Spunt used their roles to immerse Ms. Cojocaru and Ms. Haber in an environment which normalized completely abhorrent, offensive and unlawful conduct, including unwanted sexual touching, sexual assault and rape.

6.       Moreover,  these professors would openly drink alcohol (often with underage students) and use illegal drugs in The Swamp (including marijuana, cocaine and cocaine derivatives, heroin and LSD) and thrust these substances upon students as well, creating an

3

environment where they could more easily act with impunity.  Mr. Curtis and others not only used these drugs openly in The Swamp, but sold them to other faculty members and students, and asked others to help them distribute these illegal substances.

7.      Eventually, Ms. Cojocaru and Ms. Haber gathered the strength and courage to file formal complaints with John Jay's Title IX office.  However, even then, Ms. Cojocaru and Ms. Haber were forced to relive the pain of these experiences over the course of the next year, as John Jay engaged in an investigation that was completely improper and violated CUNY's own policies and procedures.  CUNY's investigation was blatantly biased, lacked even very basic due process safeguards and was clearly intended only to protect the institution rather than Ms. Cojocaru and Ms. Haber's rights.

8.      Ms. Cojocaru and Ms. Haber's numerous pleas and appeals to John Jay's in-house attorneys explaining the numerous serious inadequacies of the investigation fell on deaf ears. Ms. Cojocaru and Ms. Haber's concerns were swiftly dismissed without any genuine consideration by CUNY.  To that end, Ms. Cojocaru and Ms. Haber are in possession of documentary evidence substantiating improper conduct in the investigation, but CUNY never once asked or inquired about the issues before summarily dismissing their appeals.  This conduct flies directly in the face of the image John Jay attempts portray to the public – as an institution which promotes justice and protects students who have experienced any form of sexual violence.

9.      Ms. Cojocaru and Ms. Haber bring this action to hold John Jay, Mr. Curtis, Mr. Marcus and others accountable for the sexist, discriminatory and hostile environment they were subjected to at John Jay, and to ensure that others are not forced to endure the same mistreatment.  Accordingly, Plaintiffs assert the claims set forth below under Title IX of the Education Amendments Act of 1972, 20 U.S.C. §1681 *et seq.* ("Title IX"), the Equal Protection

Clause of the Fourteenth Amendment, enforceable under Section 1983, 42 U.S.C. §1983 *et seq.* ("Section 1983"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL") and the Gender Motivated Violence Act, N.Y.C. Admin. Code § 8-901 *et seq.* ("GMVA").

## ADMINISTRATIVE PROCEDURES

10.      Following the filing of this Complaint, Ms. Cojocaru will file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.*, as amended by the ADA Amendments Act ("ADA").  When the EEOC issues Ms. Cojocaru's notice of right to sue, she will seek leave to amend this Complaint to add claims for Defendant's violation of Title VII and the ADA.

11.      Pursuant to NYCHRL § 8-502, a copy of the original Complaint will be served upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, within ten days of its filing, thereby satisfying the notice requirements of that section.

12.      Any and all other prerequisites to the filing of this suit have been met

## JURISDICTION AND VENUE

13.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiffs' rights under Title IX and Section 1983.  The Court has supplemental jurisdiction over

Plaintiffs' related claims arising under New York State and New York City law pursuant to 28 U.S.C. § 1367(a).

14.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant John Jay's headquarters are located within the Southern District of New York and a substantial part of the events or omissions giving rise to this action, including the unlawful practices alleged herein, occurred in this district.

## PARTIES

15.    Plaintiff Claudia Cojocaru is a 40 year-old former student and former adjunct professor at John Jay.  She is a permanent resident of the United States and a resident of the State of New York.  Ms. Cojocaru attended John Jay from 2012 through 2014.  She was employed at John Jay as an adjunct professor from January 2017 through May 2019.

16.    Plaintiff Naomi Haber is a 25 year-old former student of John Jay.  She is a citizen of the United States and a citizen of the State of New York.  Ms. Haber attended John Jay from 2013 through 2017.

17.    Defendant City University of New York ("CUNY") d/b/a John Jay College of Criminal Justice is a public university formed pursuant to the laws of the State of New York. CUNY's principal place of business is in New York County, New York.  CUNY is responsible for the welfare, education and safety of students attending its schools, including at John Jay.

18.    Defendant Ric Curtis is a John Jay professor who, upon information and belief, resides in the State of New York.  Mr. Curtis has worked at John Jay for approximately 33 years, and is currently a professor and in the Anthropology Department.  Mr. Curtis has previously served as the Chair of the Anthropology Department, as well as the Interim Chair of a number of departments at John Jay, including the Sociology Department and the Law and Police Science

Department.  Mr. Curtis has a Ph.D. in Applied Anthropology and Education from Columbia

University, and has led numerous studies in human trafficking, prostitution and drug use in New

York City.  Mr. Curtis teaches several courses at the undergraduate and graduate level, and has

published various books and peer reviewed articles, including: Dispensing Justice Locally: The

Implementation and Effects of the Midtown Community Court; Social capital or networks,

negotiations and norms? A neighborhood case study and Prevalence and correlates of anal sex

with men among young adult women in an inner city minority neighborhood.

19.     Defendant Anthony Marcus is a John Jay professor, who, upon information and

belief, resides in the State of New York.  Mr. Marcus has worked at John Jay for approximately

10 years, and is currently a professor of Anthropology, Deviance Studies and International

Criminal Justice and the Chair of the Anthropology and Deviant Studies Department.  Mr.

Marcus also frequently consults litigants and testifies in state and federal trials as an expert

witness in the subject of compelled prostitution and sex-trafficking.  He holds a Ph.D. in Cultural

Anthropology from CUNY, and has led several studies in gender and sexuality, poverty, public

policy and social deviance.  Mr. Marcus teaches numerous courses at the undergraduate and

graduate levels, and has published peer reviewed articles, including:  Pimping and Profitability:

Testing the Economics of Trafficking in Street Sex Markets in Atlantic City; Pimping and

Profitability: Testing the Economics of Trafficking in Street Sex Markets in Atlantic City, New

Jersey and Implementing Policy for Invisible Populations: Social Work and Social Policy in a

Federal Anti-Trafficking Taskforce in the United States.

20.     Defendant Leonardo Dominguez is a John Jay adjunct professor who, upon

information and belief, resides in the State of New York.  Mr. Dominguez has worked at John

Jay as an adjunct professor for approximately six years.  Mr. Dominguez is also a Research

analyst for the CUNY Institute for Implementation Science in Population Health, where he works on projects at the intersection of criminal justice and public health.  Mr. Dominguez has a Bachelor of Arts from John Jay, a Master of Public Health degree in Urban Public Health from the City University of New York – Hunter College and a Master of Public Health in Epidemiology and Biostatistics from the City University of New York School of Public Health.

21.     Defendant Bary Spunt is a John Jay professor, who, upon information and belief, resides in the State of New York.  Mr. Spunt has worked at John Jay for approximately 26 years, and is currently a professor of Sociology.  Mr. Spunt previously served as the Chair and Deputy Chair of the Department of Sociology at John Jay.  He holds a Ph.D. in Sociology from Fordham University, and has conducted several studies in drug use and violence.  Mr. Spunt teaches numerous sociology courses John Jay, and has published peer reviewed articles, including: Heroin and Music in New York City, The Current New York City Heroin Scene  and Pathological Gambling and Substance Misuse.

## FACTUAL ALLEGATIONS

## I.     PLAINTIFF CLAUDIA COJOCARU

### A.     Background

22.     Claudia Cojocaru is a professor, ethnographer and social justice activist with an expertise in human trafficking, sexual exploitation and volunteer sex works.

23.     Ms. Cojocaru is a published author who has extensively researched and written about human trafficking, sexual exploitation, sex workers and movements that stigmatize and marginalize already vulnerable women.

8

24.     Ms. Cojocaru has a Bachelor of Arts in Forensic Psychology from John Jay and a Master's Degree in Criminal Justice from Rutgers University School of Criminal Justice in Newark.

25.     Ms. Cojocaru was born in Romania.  Ms. Cojocaru was formerly a victim of the sex trafficking industry herself.  As a young woman, Ms. Cojocaru was abducted by a person in her neighborhood and sold to a pimp.  Thankfully, Ms. Cojocaru eventually escaped.

26.     However, in her attempt to escape and leave Romania, Ms. Cojocaru was lured into false promises of a job in Japan.  When she arrived in Tokyo, she was exploited and sexually abused by the people she trusted.  Ms. Cojocaru made multiple attempts to escape the sexually abusive and violent situation, and was eventually successful.

27.     Thereafter, Ms. Cojocaru decided to stay in Tokyo, and devoted the next eight years to helping both trafficked and voluntary sex workers in Japan escape and find shelter.

28.     In May 2008, Ms. Cojocaru visited a friend in the United States.  In October 2008, Ms. Cojocaru married and applied for a green card.  She became a U.S. permanent resident in 2011 under the Violence Against Women Act, which permits victims of sex trafficking and violence to obtain residence in the United States.

29.     In 2011, Ms. Cojocaru decided to pursue an advanced degree to expand her knowledge in the field of sex trafficking.  Ms. Cojocaru began her college education at the Borough of Manhattan Community College.

30.     In January 2012, Ms. Cojocaru transferred to John Jay.

**B.** **Ms. Cojocaru Starts at John Jay; Assaulted by Professor Albert Lampasso**

31. Shortly after commencing her studies at John Jay in January of 2012, Ms. Cojocaru signed up for a psychology course with long-time adjunct professor, Albert Lampasso. Upon information and belief, Mr. Lampasso is currently at least 70 years old.

32. A few weeks into the semester, Mr. Lampasso approached Ms. Cojocaru after a lecture and asked if she was available to come to his apartment over the weekend to pick up a USB drive with copies of the PowerPoint presentation slides she could distribute to the class.

33. Ms. Cojocaru, having no reason to suspect that her professor had nefarious intentions, agreed. That Sunday, on her way to meet her friends, Ms. Cojocaru stopped by Mr. Lampasso's apartment for what she thought was the simple errand of picking up a USB drive. Mr. Lampasso welcomed her inside.

34. Once inside, Mr. Lampasso locked the door and brought Ms. Cojocaru towards a section of his apartment where he stored weapons, including numerous guns as well as a Samurai sword. Mr. Lampasso described in detail how much damage and pain he could cause with each weapon. Ms. Cojocaru felt that Mr. Lampasso was trying to intimidate and scare her.

35. Immediately after displaying his weapons, Mr. Lampasso showed Ms. Cojocaru a photograph of his ex-girlfriend, opined of their recent breakup and called her a "**nasty bitch**." Despite the fact that Ms. Cojocaru had expressed absolutely no interest in him, that he was her professor and that he was over 30 years her senior, Mr. Lampasso then asked Ms. Cojocaru if she wanted to go on a date with him.

36. Ms. Cojocaru tried to politely explain that she only came to pick up the USB drive and indicated her desire to leave without upsetting him. Mr. Lampasso responded "**I know you like me**," "**you're wearing the red lipstick and dress just for me**," and "**suck me off**."

37.     Ms. Cojocaru, who had survived extensive encounters of sexual violence, became extremely concerned that if she rejected him too harshly, Mr. Lampasso would attempt to sexually assault her.  Ms. Cojocaru recoiled and said she was seeing somebody else, trying to convey that she was not interested in Lampasso's advances.

38.     Mr. Lampasso, undeterred, said "**suck me off**, **and then you can go**.  **I am a police psychologist and I still have my gun if you want to see it?  It's just a blowjob**, **it doesn't hurt at all**," and began kissing her and touching Ms. Cojocaru's breasts without her consent.

39.     Ms. Cojocaru was certain that Mr. Lampasso would attack and rape her if she could not successfully remove herself from the situation, but was terrified that if she screamed or tried to get away, Mr. Lampasso might use one of his weapons he showed her earlier.  Thinking quickly, Ms. Cojocaru told Mr. Lampasso that she was meeting friends for brunch, and that they might call the police if she arrived late.  Mr. Lampasso got very angry and forcibly walked her out of the apartment.

40.     Thereafter, Mr. Lampasso retaliated against Ms. Cojocaru for refusing to cede to his sexual demands.  At the end of the semester, even though she had spearheaded the studying efforts of her class and lead her class study group, Ms. Cojocaru received a B-, while nearly all of her classmates received an A.  After receiving her grade, Ms. Cojocaru approached Mr. Lampasso and asked if he had given her a poor grade to punish her for refusing to comply with his sexual advances.  Mr. Lampasso denied that the grade was tied to her rebuffing his advances, and outrageously responded that he gave her a bad grade "**because your work is trash**."

41.     Ms. Cojocaru, knowing that Mr. Lampasso was retaliating against her, wanted to file a complaint and make sure no other student endured his sexist, predatory and retaliatory

behavior.  Unsure of where to turn, Ms. Cojocaru went to John Jay's Office of Accessibility,

where she had previously gone to request accommodations for her Post Traumatic Stress

Disorder ("PTSD").

42.     Initially, Ms. Cojocaru met with Crystal Vasquez (Assistant Director,

Accessibility Services) and provided a detailed account of Mr. Lampasso's sexual assault at his

apartment and Mr. Lampasso's subsequent retaliatory conduct.  Ms. Vasquez directed Ms.

Cojocaru to John Jay's Title IX office ("Title IX Office"), where she went that same day.

43.     At the Title IX Office, Ms. Cojocaru met with Silvia Montalban (the former

Director of Compliance and Diversity and a Title IX Coordinator) and explained the entire

situation in detail.  Ms. Montalban requested that Ms. Cojocaru detail her complaint in writing,

and informed Ms. Cojocaru that her complaint would be investigated pursuant to school policy.

Ms. Cojocaru agreed, and within one week sent Ms. Montalban a written complaint.  Ms.

Cojocaru was never provided with any findings from any investigation.

44.     In May 2018, many years later when Ms. Cojocaru filed additional complaints,

Ms. Cojocaru again followed up with Ms. Montalban and reminded her about the investigation

and her complaint regarding Mr. Lampasso.  Contrary to school policy, Ms. Montalban told Ms.

Cojocaru that there was nothing the school could do.  Ms. Cojocaru was never given any

explanation for why her complaint had not been investigated many years earlier.

**C.     Ms. Cojocaru Meets Ric Curtis; Is Introduced to "The Swamp"**

45.     In or around September 2013, Ms. Cojocaru sought out help from a professor

concerning immigration policy and its applicability for victims of human trafficking.  Ms.

Cojocaru was encouraged by her psychology professor to reach out to Mr. Curtis, who was

widely recognized as a leader in the field of human sex trafficking.

46.     Ms. Cojocaru emailed Mr. Curtis, who responded by asking her to stop by his "office" to discuss the issues.  Ms. Cojocaru looked up Mr. Curtis's office location on John Jay's website, and went to that office for their scheduled meeting, but Mr. Curtis was nowhere to be found.  After a few minutes, Ms. Cojocaru received an angry call from Mr. Curtis asking where she was, and he told her that his office was actually on the seventh floor of John Jay's Annex Building.  Ms. Cojocaru later learned that this area was referred to as "The Swamp."

47.     "The Swamp," as Ms. Cojocaru would later learn, was a term Mr. Curtis and his clique of professors (including but not limited to Mr. Marcus and Mr. Dominguez) used to refer to a suite of offices on the seventh floor of John Jay's Annex Building (and other areas where they had offices) to describe a virtual off-the-grid environment in which Mr. Curtis, Mr. Marcus, Mr. Dominguez and others would act openly hostile and with indignation and disdain to norms of the law, ethics and morality, which they apparently believed did not apply to them.

48.     In The Swamp, Mr. Curtis, Mr. Marcus, Mr. Dominguez and other faculty often degraded and dehumanized female colleagues and students.  For instance, Ms. Cojocaru has heard Mr. Curtis, Mr. Marcus, Mr. Dominguez and Mr. Spunt describe female students as:

- **"Cunts**,"

- **"Bitches**,"

- **"Stupid Bitches**,"

- **"Lesbians**," in reference not to sexual orientation, but as a demeaning and disparaging term,

- **"Lesbian Bitches**,"

- **"Sluts**,"

- **"Stupid Sluts**,"

- **"Whores**,"

13

- **"Idiots**,"

- **"Crazy**," and

- **"Psychotic**."

49.     As an egregious example, one member of The Swamp texted Ms. Cojocaru "**You're some dumb cunt who got trafficked**."



50.     For instance, Mr. Curtis referred to a John Jay student who had claimed she was raped by a John Jay professor as "**a pathological liar**" and "**a slut who said that everyone raped her**."

51.     Also by way of example, Mr. Marcus referred to Masters and Ph.D. students as "**intellectual whore grad students**."

52.     Also by way of example only, upon receiving multiple calls from a student, Mr. Curtis said "**that cunt [student's name] won't leave me alone**."

53.     As another example, while devising a scheme to "hook up" a John Jay student with one of his colleagues in order to avoid her, Mr. Curtis said "**there must be some asshole we can inflict her upon**."

54.     Mr. Curtis, Mr. Marcus, Mr. Dominguez and Mr. Spunt, and others also used hypersexualized language to describe women (including students many years their junior and their faculty peers) and denigrated women based on their looks.  The following are mere examples:

- "**I'd tap that**," referring to members of the student body and other faculty.

- "**I joined Tinder because I want to fuck, not because I want to date**."

- "**I would hit that if she wasn't so crazy**," referring to a student.

- "**I would tap that if she hadn't gotten fat, now she looks like a dump**," referring to a student.

- "**If I have another drink or two later, even [the student] will look good**."

- Mr. Curtis described a student as "**crazy in bed**."

55.    Moreover, in The Swamp, these professors would openly use illegal drugs (including marijuana, cocaine and cocaine derivatives, heroin and LSD) and thrust these substances upon students as well, in order to further immerse them into the deviance of this environment and get them to "let their guard down."  Below is a photograph from "The Swamp" showing drugs and drug paraphernalia openly displayed in Mr. Curtis' office:



56.    Mr. Efram Thompson ("Memph"), a former pimp with no connection to John Jay, was often in The Swamp at Mr. Curtis's invitation.  Upon information and belief, Mr. Curtis bought his illegal drugs from Memph.  Mr. Curtis told Ms. Cojocaru and Ms. Haber on multiple occasions that if anyone was harassing them, he could have Memph "take care of it," which was understood to mean that he would violently threaten and/or attack the person.

57.    For instance, Ms. Cojocaru told Mr. Curtis that Mr. Lampasso had sexually assaulted her; however, Mr. Curtis did not follow up with the Title IX Office or encourage Ms. Cojocaru to proceed through the school's prescribed methods.  Rather, Mr. Curtis offered to have Memph "fuck him up."  Mr. Curtis made clear to Ms. Cojocaru and Ms. Haber that he was willing and capable of asking Memph to violently attack people on his behalf.

58.    During Ms. Cojocaru's first visit to The Swamp, Mr. Curtis introduced her to Mr. Dominguez and a woman who Mr. Curtis introduced as "[his] girl."  Ms. Cojocaru was under the impression that this woman was Mr. Curtis's wife.  However, it wasn't until weeks later that she learned that this woman was actually Mr. Curtis's "mistress," that he openly flaunted their extra-marital relationship and that he was married to another woman.

59.    Mr. Curtis asked why Ms. Cojocaru was interested in his help, and Ms. Cojocaru explained her situation which included that she had been the victim of sex trafficking.  Despite the seriousness of this issue and the sensitivity with which it should have been addressed, Mr. Curtis acted excited to hear this and responded:  "Oooooh tell me more," as if he was listening to inane gossip rather than learning of his student's difficult history with sexual violence.

60.    Ms. Cojocaru told Mr. Curtis she did not want to discuss it, but Mr. Curtis would not want to take "no" for an answer.  Mr. Curtis continued to pry until Ms. Cojocaru relented and gave him additional intimate information about her plight.  At the end of their conversation, Mr.

Curtis told Ms. Cojocaru that if she came back and continued their discussion, he would offer her paid research opportunities.

61.     While Ms. Cojocaru thought Mr. Curtis acted in an entirely offensive manner that made her very uncomfortable, she understood that Mr. Curtis was an influential and well-respected professor and questioned her own instincts.  Moreover, as Ms. Cojocaru was interested in the field in which he was an expert, she did not want to unnecessarily lose an opportunity to gain valuable experience.  As such, Ms. Cojocaru decided to take Mr. Curtis up on his offer and return to The Swamp.

62.     Thereafter, every time Ms. Cojocaru returned to The Swamp, Mr. Curtis asked her more and more personal information about her experience with sex trafficking and her involvement in the anti-trafficking movement.  Ms. Cojocaru also explained that she worked with activists in the field to help trafficked and voluntary sex workers.

63.     Mr. Curtis actively tried to dissuade Ms. Cojocaru from her involvement with sex trafficking activists, and convince her to instead spend her time with him in The Swamp and to help him with his research projects.  Ms. Cojocaru was susceptible to Mr. Curtis' opinion and influence.  Over time, Ms. Cojocaru was pressured to spend an increasing amount of time in The Swamp, and her connections with others dissipated.  Mr. Curtis also convinced Ms. Cojocaru to stop taking her prescription anti-anxiety and anti-depression medication, leaving Ms. Cojocaru even more vulnerable and easily manipulated.

64.     Mr. Curtis also introduced Ms. Cojocaru to other members of his "crew" including, but not limited to, Mr. Marcus, Mr. Dominguez and others.  Mr. Curtis, Mr. Marcus and Mr. Dominguez encouraged the others in The Swamp to follow their lead in all regards: they coaxed others into drinking alcohol, using illegal drugs and speaking in offensive, sexist and

17

misogynistic terms.  Ms. Cojocaru was led to believe by professors whom she trusted, relied on and looked up to that this was appropriate and acceptable conduct.  In effect, in the environment of The Swamp, this conduct was normalized by those who believed in alternate morality.

65.    Ms. Cojocaru also observed Mr. Curtis and others use and/or sell drugs in The Swamp.  Mr. Curtis stored marijuana, cocaine, heroin and LSD in The Swamp, and faculty, staff, students and other drug users would come to The Swamp with the intention of using and/or buying these drugs.[2]

66.    Ms. Cojocaru witnessed a rotating cast of John Jay faculty, staff and students engage in drug use with Mr. Curtis and others in The Swamp, which has been confirmed by several other witnesses as well.  Much to Mr. Curtis's dismay, although Ms. Cojocaru had been enveloped in The Swamp's culture, she never partook in drug use.

67.    After a few weeks of visiting The Swamp, Mr. Curtis began inviting Ms. Cojocaru to parties and to travel with him to conferences.  This was highly unusual and unorthodox conduct, particularly considering that Ms. Cojocaru was an undergraduate student at the time.  Mr. Curtis advertised these opportunities to Ms. Cojocaru as networking events, when in fact they were Mr. Curtis's excuse to pull Ms. Cojocaru away from campus to more freely sexually harass her.

68.    For example, Mr. Curtis and Mr. Dominguez invited Ms. Cojocaru to a party at the home of John Jay professor of sociology, David Brotherton.  At the party, Mr. Curtis – who almost certainly had been drinking and engaging in drug use – relentlessly tried to persuade Ms. Cojocaru to "go upstairs" to one of the bedrooms and sleep with him.  Ms. Cojocaru repeatedly declined.

---

[2]    Ms. Cojocaru personally witnessed Mr. Curtis use cocaine, heroin and marijuana.

69.     Later that evening, Mr. Curtis approached Ms. Cojocaru in the kitchen from behind.  Mr. Curtis put his hands on her hips, grabbed her and thrust his groin into her backside twice, such that Ms. Cojocaru could feel his erect penis through the clothing.  Ms. Cojocaru froze, completely unsure of what to do or how to handle the situation.

70.     After Mr. Curtis walked away, Ms. Cojocaru ran to Mr. Brotherton and told him what Mr. Curtis had done, begging Mr. Brotherton to "**help get him off me**."  Mr. Brotherton just laughed and said, "**Oh**, **that's just Ric being Ric**."  This demonstrated the normalization and acceptance of sexually harassing behavior by professors towards much younger students.

71.     Thereafter, Mr. Curtis began touching Ms. Cojocaru with increasing frequency without her consent.  Mr. Curtis repeatedly approached her while she was doing research and rubbed his hands against her breasts, legs, shoulders, back and neck.  If Ms. Cojocaru was wearing a skirt, Mr. Curtis often tried to put his fingers on her legs and move them up her skirt.  Ms. Cojocaru tried to rebuff his advances, but her efforts were unsuccessful.

72.     In or around 2015,[3] Mr. Curtis and Mr. Dominguez pressured Ms. Cojocaru to have a threesome with Mr. Marcus and Ms. Haber.  These two professors even directed Ms. Cojocaru and Ms. Haber to show up at Mr. Marcus' apartment dressed in raincoats and with only lingerie underneath, as a reward to Mr. Marcus given that he had been working so hard.  Mr. Curtis also told Ms. Cojocaru and Ms. Haber that they were "[Mr. Marcus's] type," indicating that Mr. Curtis and Mr. Marcus had discussed their sexual fantasies of their students.

---

[3]     Although Ms. Cojocaru had graduated from John Jay's undergraduate program by then, she was often on campus to conduct research and complete writing assignments for professors in the Anthropology department, and was still very much immersed in The Swamp.  This was a continuing violation of the conduct that began while Ms. Cojocaru was a student and would further continue through the time that she later became a John Jay employee as adjunct professor.

73.     Mr. Curtis also pressured Ms. Cojocaru (as well as Ms. Haber) to have a threesome with him and his mistress on two separate occasions.  When Ms. Cojocaru told him she was not interested, Mr. Curtis responded, "you should be more adventurous, you know?  Get out of your routine and live life a little.  You know you're my girls," and proceeded to softly caress both of their arms as if it would help persuade them.

74.     During a conference in the fall of 2015, Mr. Curtis tried to trick Ms. Cojocaru and Ms. Haber into staying in his hotel room with him.  Mr. Curtis falsely told Ms. Cojocaru and Ms. Haber that he had rented a hotel room that he did not need, and that they should feel free to stay in the room before he arrived.  Shortly before the conference began, Mr. Curtis "surprised" them with the news that he planned to use his hotel room for the entirety of the conference, and invited the two of them to spend the night with him in his room.  Ms. Cojocaru and Ms. Haber thought this was highly inappropriate and declined the invitation.

75.     Other faculty members also sexually harassed Ms. Cojocaru in The Swamp.  By way of example only, in 2015, Professor Barry Spunt (Associate Professor of Sociology) groped Ms. Cojocaru and placed his hands on her buttocks while she was attempting to study.   Mr. Spunt also told Ms. Cojocaru she should "**sit on [Mr. Curtis's] lap to show [her] gratitude for all of the help [Mr. Curtis] had given [her]**."

76.     Ms. Cojocaru became so immersed in the culture of The Swamp, and these authority figures so boldly blurred the lines of acceptable conduct, that Ms. Cojocaru began to accept that this conduct was permissible.  Moreover, Ms. Cojocaru felt that even when she wanted to protest, there was nothing she could do to these well-respected professors without sacrificing her own opportunities and future.

77.     In the summer of 2015, Ms. Cojocaru was with Mr. Curtis in The Swamp at the John Jay Annex location.  Mr. Curtis encouraged Ms. Cojocaru to drink alcoholic beverages. Ms. Cojocaru suddenly began feeling dizzy and nauseous, and Mr. Curtis groped, touched and sexually assaulted her.

**D.     Ms. Cojocaru Reports a Sexual Assault Committed Against Another Woman**

78.     In or around the summer of 2014, Ms. Cojocaru learned that a John Jay student was raped by a John Jay faculty member in the faculty member's office.  This faculty member was a frequent visitor of The Swamp, and an adjunct professor working in Mr. Curtis's department.  Upon learning this, Ms. Cojocaru reported the assault to Mr. Curtis.

79.     Mr. Curtis responded by calling the student a "**slut**," who was just "**cheating on her stupid boyfriend**."  Mr. Curtis also said the student invented the entire incident, and called Ms. Cojocaru "**naïve**" for believing her.

80.     Approximately one year later, Ms. Cojocaru was devastated to learn that this student was raped by another John Jay professor.  This student told Ms. Cojocaru that after a 2015 academic conference, a professor raped her in the bathroom of the professor's hotel room.

81.     She further told Ms. Cojocaru that she had been on prescription medication which decreased her alcohol tolerance, and knowing this, the professor preyed on her by convincing her to drink alcohol, causing her to lose consciousness.  The professor then had sex with her without her consent, as she reported to Ms. Cojocaru.

82.     Ms. Cojocaru reported this incident to Mr. Curtis, who continued to mischaracterize and downplay the assault.  For example, Mr. Curtis told Ms. Cojocaru that the student "**gets drunk every year at [the conference] and vomits all over the bathroom after she allegedly gets raped**."  He also told Ms. Cojocaru that this student "**flirted**" with the

professor and described the event as "**they fucked**," making it seem as though the incident was consensual.

83.     Sometime later, Ms. Cojocaru was having a drink with another student at John Jay, and that student confided in Ms. Cojocaru that Mr. Curtis told her he "**fucked [another student] so hard that she vomited**."

84.     Taken together, Ms. Cojocaru's academic experience at John Jay was a constant barrage of sexual harassment, sexual assault, sexual innuendo and illegal drugs.  Ms. Cojocaru's complaints about this hostile and *quid pro quo* environment were completely ineffective, as the school had no system in place to legitimately address this conduct by a well-respected professor. Ms. Cojocaru was deprived an educational environment free from discrimination, sexual harassment, sexism and misogyny.

**E.     Ms. Cojocaru Graduates from John Jay, Yet is Unable to Escape Mr. Curtis**

85.      Ms. Cojocaru graduated from John Jay in August 2014, and was ecstatic to begin graduate school.  She enrolled in a graduate degree program in Criminal Justice at Rutgers University ("Rutgers"), where she believed she could escape Mr. Curtis's influence.  However, Mr. Curtis's harassing conduct remained ongoing as part of an ongoing continuing violation of Ms. Cojocaru's rights that started while she was a student.

86.     Ms. Cojocaru felt as though she could not escape Mr. Curtis, and though she was able to keep more distance, Mr. Curtis did not leave her alone.  He constantly texted her, called her and checked in with her.  Ms. Cojocaru learned to repress her disgust and fear so that she could remain on friendly terms with him and his clique, who were her only network of friends and supposed support.

87.     Mr. Curtis also supplied drugs to Ms. Cojocaru's professors at Rutgers and pressured Ms. Cojocaru to transport drugs from John Jay to Rutgers to give to her professors. Ms. Cojocaru was extremely uncomfortable being in possession of drugs – and even more uncomfortable transporting drugs across state lines – but Mr. Curtis continued to pressure her to do so.  Ms. Cojocaru never acceded to this demand.

88.     At the same time, Mr. Curtis continued to give Ms. Cojocaru research projects, despite the fact that she was not formally a student or employee of John Jay.  During her breaks from school at Rutgers, Ms. Cojocaru spent 40 hours per week or more working on research for Mr. Curtis.

89.     Mr. Curtis promised Ms. Cojocaru that she would be paid for her work "as soon as the grants kicked in."  However, Ms. Cojocaru was never paid for this work.  Mr. Curtis also took Ms. Cojocaru's work and passed it off as his own.[4]

90.     In or around May 2016, as her year-long graduate program came to a close, Ms. Cojocaru was extremely concerned about finding post-graduate employment.  Mr. Curtis coordinated for Ms. Cojocaru to get an adjunct teaching position at John Jay, and in Spring 2017, at Mr. Curtis's urging, Ms. Cojocaru was hired by John Jay to teach two college courses, "Drug Use and Abuse" and "Sex and Culture."  For this work, Mr. Cojocaru was actually paid wages.

91.     As a professor, Ms. Cojocaru tried to keep her distance from The Swamp, knowing the danger and depression she had suffered when she was immersed in that environment as an undergraduate.  However, as an adjunct in Mr. Curtis's department, it was nearly impossible to avoid him.

---

[4]     Ms. Cojocaru witnessed Mr. Curtis steal many of his students' work and/or ideas and pass them off as his own.

92.     Mr. Curtis frequently suggested highly unethical ideas for Ms. Cojocaru's class on drug use.  By way of example only, Mr. Curtis suggested Ms. Cojocaru bring her students to an area of New York City where people often used illegal drugs so that her students could experience "drug use in the wild."  Mr. Curtis suggested students pick up trash (which included used and dirty needles) and help clean addicts' wounds.

93.     Ms. Cojocaru declined this outrageous suggestion, but learned that Mr. Curtis was engaging in this unethical behavior on his own.  By way of example only, Mr. Curtis told Ms. Cojocaru that he brought a class of freshman and sophomores (18 and 19 year-olds) to an area frequented by drug dealers, drug users and pimps.  One man, high on drugs, grabbed one of the female students and refused to let her go.  Mr. Curtis had to physically threaten this man to get him off of the student.

**F.      Unethical Academic Practices; Mr. Marcus's Assault on Ms. Cojocaru**

94.     In or around October 2017, Mr. Marcus and Ms. Cojocaru attended a conference in Philadelphia.  The first night, Ms. Cojocaru and Mr. Marcus began discussing a rumor Ms. Cojocaru had heard; namely, that in their sex trafficking research, Mr. Curtis and Mr. Marcus were said to have engaged in unethical and unlawful sexual relationships with their underage research subjects.

95.     That night, Mr. Marcus confirmed that he indeed had sexual intercourse with the underage trafficked women in that study.  Mr. Marcus attempted to justify his behavior by saying they were volunteer sex workers who "wanted it, and just wanted to get paid."  Ms. Cojocaru was absolutely disgusted that they had engaged in such reprehensible, unethical and unlawful behavior.

96.     At the end of the next day, Mr. Marcus came to Ms. Cojocaru's hotel room to pick up a copy of their presentation.  Ms. Cojocaru, who was on the hotel bed, suggested that Mr. Marcus read a paper she wrote because it addressed a research topic the two had been discussing earlier in the week.  Mr. Marcus jumped onto the bed next to Ms. Cojocaru.  Ms. Cojocaru tried to move, but Mr. Marcus grabbed her and punched her in the head multiple times saying, "**You all have this smart mouth**.  **You fucking bitches**.  **You think you're so smart**."[5]

97.     In total, the horrific, unlawful environment Ms. Cojocaru was subjected to while a student at John Jay continued even after she graduated, enrolled at another institution and then re-joined John Jay as an adjunct professor.  Ms. Cojocaru was subjected to a continuing violation of unlawful discriminatory and harassing treatment.

## II.     PLAINTIFF NAOMI HABER

### A.     Background

98.     Plaintiff Naomi Haber is an English Language Arts and College Preparation Instructor, and a recent graduate of John Jay.  Ms. Haber attended John Jay from September 2013 through January 2018.  Ms. Haber holds a Bachelor of Arts in Unique and Interdisciplinary Studies with a concentration  in Language and Culture and Critical Media Studies.

99.     Prior to attending John Jay, Ms. Haber grew up in an Orthodox Jewish community in Monsey, New York.  As a teenager, Ms. Haber's family moved into a more religiously devout Hasidic community.   Ms. Haber always had a strong passion for justice and interest in combatting sex crimes in New York.

---

[5]     This was not the first time Marcus became violent with Ms. Cojocaru.  Earlier that year, Marcus, completely unprompted, shoved Ms. Cojocaru against the wall.  He then pretended nothing happened.

100.     Despite pressure to remain in the Hasidic community and not attend college, Ms. Haber decided to depart from her conservative upbringing, and she applied to John Jay to study criminal justice.  Ms. Haber was overjoyed when she learned she was accepted to John Jay, and made the difficult decision to move away from the only community she was familiar with to begin classes in Manhattan.

101.     When Ms. Haber arrived on campus, she experienced an incredibly intense culture shock.  She immediately joined numerous clubs and activities on campus, and designed her own unique major tailored to her interest and passion.

**B.**     **Ms. Haber is Harassed by a Professor; Mr. Curtis Tries to Bribe Her**

102.     In Fall 2014, Ms. Haber enrolled in a sociology course at John Jay with Professor Jeanmaire Manelski.  Approximately two weeks into the course, Ms. Manelski began contacting Ms. Haber after class and on weekends to discuss what Ms. Haber believed to be unreasonable conspiracy theories of terrorist activity in the United States.

103.     Ms. Manelski called Ms. Haber multiple times a day, often extremely upset about ISIS and undercover terrorist training camps in the United States.  Ms. Haber, worried by what she perceived to be erratic behavior, approached Dr. Dara Byrne (then-Director of the Honors Program, now Dean of Undergraduate Students) to raise her concerns.

104.     Ms. Byrne, in turn, advised Ms. Haber to discuss the conduct with John Jay's Office of Public Safety.  Ms. Haber went straight to the Office of Public Safety and provided a statement detailing the conduct.  Shortly thereafter, Ms. Haber was surprised to receive an email from Mr. Curtis (then-Interim Sociology Department Chair), whom she had never before met.

105.     Mr. Curtis wrote to Ms. Haber that he wanted to meet with her and David Green (Deputy Sociology Department Chair) to discuss her concerns.  Ms. Haber agreed, and they set

up a meeting for later that afternoon.  Mr. Curtis started the meeting by offering Ms. Haber a

bribe – he told her that if she withdrew her complaint against Ms. Manelski, he would personally

ensure that she received an "A" in her course.  Mr. Curtis told her that these complaints would be

a burden for him to investigate and he preferred not to have to do the work.

106.    Ms. Haber looked at Mr. Curtis in disbelief.  Mr. Curtis continued to pressure Ms.

Haber to drop the complaint, letting Ms. Haber know that if she did not, Ms. Manelski likely

would end up "unemployed and homeless."  Ms. Haber told Mr. Curtis that she did not need him

"to give [her] an A," and that she could earn the grade without his help.

107.    Mr. Curtis, undeterred, continued to try to bribe Ms. Haber.  Mr. Curtis asked Ms.

Haber, "what [she] likes," and offered her tickets to an upcoming gala event.  Ms. Haber again

declined Mr. Curtis's offer of special treatment.

108.    However, Ms. Haber had been having difficulty with her German Language

professor, who refused to accommodate her observance of the Jewish holidays and required her

to submit schoolwork on these days in violation her religious beliefs.  Ms. Haber asked if there

was anything Mr. Curtis could do to make sure this professor did not violate school policy and

accommodated her religious practices.  Mr. Curtis agreed to help, and asked Ms. Haber to return

to his office later that day,

109.    However, Mr. Curtis never actually addressed the issue with the German

Language professor.  When Ms. Haber followed up, Mr. Curtis joked that he should have "taken

one for the team," and asked Ms. Haber whether the professor enjoyed "eating wiener schnitzel."

At the time, Ms. Haber did not understand Mr. Curtis's question, and told Mr. Curtis he could

ask her himself.  Ms. Haber later came to realize that Mr. Curtis was offering to sleep with her

professor to get her to give Ms. Haber a better grade.

### C.    Mr. Curtis Begins Onslaught of Isolation and Harassment

110.    That same day, Ms. Haber met Mr. Curtis at his "sociology office," which she later learned was part of something he called "The Swamp."  Ms. Haber immediately recognized that this was not a normal college office.  She saw bottles of alcohol everywhere and a windowed back office where two professors were smoking marijuana.

111.    Mr. Curtis motioned for Ms. Haber to sit down with him, and he began telling her about the anti-trafficking movement and efforts to decriminalize sex work, feeling her out for her opinion on human trafficking and prostitution.  Ms. Haber found the whole conversation to be extremely uncomfortable.  Then Mr. Curtis abruptly said, "let me show you something" and went to his computer and showed Ms. Haber a video of a woman putting a condom on a plastic dildo.

112.    Ms. Haber, extremely embarrassed and uncomfortable, asked Mr. Curtis why he showed her this video.  Mr. Curtis responded, "Why do you think I am showing you this?"  Ms. Haber, unsure of how to best diffuse the situation, said she was unsure, and looked down at the ground in discomfort.  When the video ended, Mr. Curtis said "let me show you something else," and pulled up a video of him on an exercise ball bouncing with his shirt off.  Ms. Haber, extremely uncomfortable again, tried to avoid looking at the screen.

113.    Mr. Curtis then turned off the video, and opened up his email account to draft a new email to Jane Bowers (John Jay's Provost) and other members of the John Jay staff, informing them that Ms. Haber would not be meeting with public safety and that he wanted to discuss further in person, rather than over email.  After sending the email, Mr. Curtis turned to Ms. Haber and told her they were now "partners in crime," and gave her his personal phone number in case her professor "says something crazy."  Over the next few weeks, Mr. Curtis

stopped by Ms. Haber's class to "make sure [she] was doing OK" and to "make sure Professor Manelski kept the crazy on the low."

114.     In January 2015, Ms. Haber began spending time studying and researching in the sociology office near one of Mr. Curtis's offices.  Ms. Haber passed by Mr. Curtis in the department frequently.  Eventually, Mr. Curtis invited Ms. Haber to join him in The Swamp. When Ms. Haber accepted this invitation, she was bombarded with an environment permeated with sexual misconduct and illegal drug use, nearly identical to Ms. Cojocaru's experiences.

115.     In The Swamp, Ms. Haber observed illegal drug use, including marijuana, cocaine and heroin, by Mr. Curtis and others.  Ms. Haber also witnessed Mr. Curtis sell illegal drugs to other students and faculty members.  Moreover, Mr. Curtis began putting immense pressure on Ms. Haber to stop taking her prescription medications, and to replace them with marijuana.  Ms. Haber eventually complied, and became dependent on marijuana, and, in turn, on Mr. Curtis.

### D.     Ms. Haber is Sexually Harassed by Professor Carlton Jama Adams

116.     In or around summer 2015, Ms. Haber went to office hours for one of her professors, Carlton Jama Adams (Africana Studies Department Chair).  When she entered, he locked the door.  Ms. Haber felt it was strange, but was unsure what was "normal" given that she was a freshman and was far outside the environment where she grew up.  However, Mr. Adams then sat next to Ms. Haber, placed his hands on her leg and began caressing her upper thighs. Ms. Haber immediately tried to remove herself from the situation.

117.     When she left Mr. Adams' office, she did not know what to do.  Ms. Haber first complained to Crystal Jackson (an assistant professor), who told Ms. Haber that she was a mandatory reporter for John Jay.  As a mandatory reporter, Ms. Jackson would be required to escalate all complaints of sexual harassment to the appropriate department at John Jay.  Ms.

Haber also complained to Ms. Byrne (then-Head of the Honors Program).  Ms. Byrne was also a mandatory reporter of sexual harassment.  Upon information and belief, neither Ms. Jackson nor Ms. Byrne escalated Ms. Haber's complaint.

118.    Ms. Haber also reported the sexual harassment to Mr. Curtis.  Mr. Curtis assured Ms. Haber that he would take care of it, and that he would escalate Ms. Haber's complaint.  Mr. Curtis also told Ms. Haber that she did not have to worry about Mr. Adams touching her ever again.  When Ms. Haber asked Mr. Curtis for advice on how to reject his advances, Mr. Curtis proceeded to joke that he would "**buy [Ms. Haber] a black vibrator for [her] birthday LOL**." Ms. Haber was deeply uncomfortable that first, her professor offered to buy her a vibrator, and second, the race-based comment that she preferred a black vibrator because she was sexually harassed by Mr. Adams, who is an African American man.



119.    Thereafter, even though Mr. Curtis was aware that Ms. Haber was uncomfortable with these comments, he continued to insist to other John Jay faculty and staff at The Swamp that Ms. Haber had a "fetish" for African American men.

**E.      Pervasive Sexual Harassment in The Swamp**

120.    Ms. Haber observed extreme misogynistic behavior and was subjected to extensive sexual harassment while in The Swamp, just like Ms. Cojocaru.  Ms. Haber, who had previously spent little time outside her religious community, looked up to her professors,

including Mr. Curtis, for guidance, and they took advantage of that power dynamic to normalize highly offensive and inappropriate conduct.

121.    Mr. Curtis became seemingly obsessed with Ms. Haber's appearance and sex life, and repeatedly pressured her to have multiple sexual partners.  Mr. Curtis asked Ms. Haber questions like "**Who are you fucking?**", "**What do you like?**" and "**Who is your type?**" to learn more about her sexual experiences and desires and draw her into uncomfortable discussions about sex that are wildly inappropriate between professor and student.

122.    Mr. Curtis and Mr. Dominguez frequently made comments to Ms. Haber about her appearance, denigrating her and destroying her self-esteem and sense of self-worth. Comments included, but were not limited to:

- "**You wear too much make-up,**"

- "**You wear too much jewelry,**"

- "**You dress up too much**,"

- "**You need to tone up your fat body**,"

- "**Your hair would look better if you buzzed it off/shaved  it off**,"

- "**You must have daddy issues**," and

- "**You have a thing for old crusty men**."

123.    Mr. Curtis began pressuring Ms. Haber and Ms. Cojocaru to lose weight, and convinced them both to join him on intense workouts every morning.  Mr. Curtis became obsessed with the idea of Ms. Haber looking thin, particularly in advance of the American Society of Criminology ("ASC") Conference, where he many times mentioned his desire to introduce them to lonely academic criminologists.

124.     Mr. Curtis made comments about Ms. Haber's body and how she needed to lose weight, and she soon developed an unhealthy image of her body.  In one text message, Mr. Curtis sent Ms. Haber a topless photograph of himself with the message: "Me and leo missed you this morning."



125.     Ms. Curtis's demeaning conduct successfully convinced Ms. Haber to have a low self-image and to transform herself into what he considered "attractive" in order to gain his acceptance and approval of her looks.

126.     At the same time, Mr. Curtis also began pressuring Ms. Haber to have sex with his colleagues, John Jay faculty members, and with potential faculty members who he was attempting to lure to the school.  For example, Mr. Curtis tried to convince Ms. Haber to sleep

with Mr. Marcus, and told her and Ms. Cojocaru that they should surprise him wearing trench coats with only lingerie underneath.

127.    Mr. Curtis also tried to arrange for Ms. Haber travel to Philadelphia with him on a trip with the intent to convince another older male professor to come to John Jay.  Mr. Curtis suggested to Ms. Haber have sex with a professor whom Mr. Curtis was hoping would come to John Jay as the Chair for the Department of Law and Police Science.  Mr. Curtis told Ms. Haber that this professor was recently divorced and "ready for a change in his life," and he needed someone to "convince him" to make a move to New York.  It was clear to Ms. Haber that Mr. Curtis wanted a 20 year-old college student to entice this professor by offering to have sex with him.  Ms. Haber refused.

128.    Mr. Curtis tried a similar tactic again when a professor at Harvard University visited John Jay.  Mr. Curtis called Ms. Haber and told her that this professor was looking for a "**Jewish Hottie**" to be set up with.  Ms. Haber was disgusted, and refused to meet him.

129.    Mr. Curtis's efforts to recruit older male professors who could be "convinced" by younger undergraduate female students was a clear effort to protect the status quo and maintain the environment that he cultivated where professors sexually preyed on and took advantage of undergraduate female students.

130.    Mr. Curtis and Mr. Dominguez also unlawfully touched and groped Ms. Haber without her consent in The Swamp.  By way of example only, Mr. Dominguez slipped his hands under Ms. Haber's shirt to touch her breasts, touched Ms. Haber's buttocks, put his hands on her legs and reached into Ms. Haber's pants to see what underwear she was wearing.  On one occasion Mr. Dominguez told Mr. Haber he wanted to "**feel [her] warm vagina**."  Moreover, Mr. Curtis often insisted that Ms. Haber massage him.

131.     Having been pulled into an environment where this conduct was normalized, Ms. Haber permitted this conduct even though it made her highly uncomfortable and gave her an extremely low sense of self-worth.  Given the frequent and repetitive nature of Mr. Curtis's and Mr. Dominguez's sexual harassment, Ms. Haber became desensitized to touch, and developed a distorted understanding of sexual boundaries in her relationships.

132.     Ms. Haber, for the first time in her life, perceived herself as worthless.  She continued to allow this conduct given that well-respected professors urged her to condone unwanted physical touch and would shun her if she refused.  As a result of the abuse, Ms. Haber became depressed and suicidal.

### F.     Mr. Marcus Harasses Ms. Haber

133.     In or around December 18, 2014, Mr. Curtis introduced Ms. Haber to Mr. Marcus (then-Chair of John Jay's Anthropology Department) at a sociology department party in Mr. Curtis's office.  Mr. Curtis set up a table of bottles of alcohol for professors and students (some underage, including Ms. Haber) to drink.

134.     Not long after the introduction, Mr. Marcus approached Ms. Haber and cornered her against a wall.  Mr. Marcus put his face very close to Ms. Haber's and told her,

> **You are so sexy.  I am just so attracted to you, but [Mr. Marcus's mistress] won't let me fuck you because you're a Zionist, apparently.  But I might make an exception this time around.**

135.     Mr. Marcus's behavior caught Ms. Haber completely off guard.  As she looked around the party, she noticed that multiple people were looking at her and Mr. Marcus.  Mr. Marcus continued,

> **If I could, I would take you to my office on the 9th Floor in the [John Jay's North Building], but it's too far and I would have**

34

**to find my keys.  This maybe a bit direct, but...there is little stopping me from putting my head between your legs**.

136.     Marcus then unexpectedly grabbed Ms. Haber's face and tried to kiss her.  Ms. Haber was shocked and barely had time to react.  Ms. Haber pushed his hand away asked him what thought he was doing, and whether he realized his colleagues were all watching.  Mr. Marcus responded that "**I don't care**" and tried to kiss her again.

137.     Ms. Haber pushed Marcus's hands away, and told him to walk away.  Mr. Marcus finally complied.  Ms. Haber looked around the room as graduate students, adjunct professors and tenured professors at the party who had witnessed the entire scene did nothing but stare.  Ms. Haber went to Professor David Green, who was her undergraduate designated mentor, and requested they talk privately about the encounter.

138.     Unfortunately, Ms. Haber learned that Mr. Marcus's sexual assault fueled a widespread rumor that she had had sex with Mr. Marcus, and then the fact that she left with Mr. Green fueled rumors that they were sexually involved as well that night.  Ms. Haber would learn that this was "par for the course" in The Swamp, where sex simply permeated the environment.

139.     Upon information and belief, Mr. Curtis encouraged rumors regarding Ms. Haber's sex life, leading to John Jay faculty, staff and students shaming, stigmatizing and gossiping about Ms. Haber.  Also upon information and belief, Mr. Green never escalated Ms. Haber's complaint about Marcus.

140.     Ms. Haber realized that she needed to work with Mr. Marcus throughout her academic career, given that her interdisciplinary studies focused on anthropological research and that Mr. Marcus was the chair of the Anthropology Department.  The following Monday, Ms. Haber visited Mr. Marcus's office and asked if he remembered her from the night before. Marcus replied that remembered her, but not her name.

141.    Ms. Haber then asked Mr. Marcus if he remembered what he had done and the comments he made to her the night before.  Mr. Marcus confirmed he remembered what happened, but that he felt "awkward" about "it."  Ms. Haber offered him an opportunity to explain himself and to hold himself accountable in some capacity.  Mr. Marcus instead gave an insincere apology, and offered to take her out to lunch so that he could "start again" and "actually get to know [her]."

142.    Mr. Marcus took Ms. Haber to an Italian restaurant near The Swamp, where he declared that he would be her new academic mentor.  Mr. Marcus also told Ms. Haber that if she wrote a research paper on a particular topic, he would publish it in his research journal.  Ms. Haber emailed Mr. Marcus soon after the lunch and declined his offer to be published in his journal.  The reason she provided was that she was concerned that it would lead to false rumors that she slept with Marcus to obtain the publishing opportunity.

143.    Mr. Marcus replied that Ms. Haber was "**making too much drama from 1 hour in which an old guy hit on you and you politely turned him down and nothing happened afterwards**" and minimized her concern regarding her reputation and entirely disregarded the unequal power dynamic between professor and student.



144.    Mr. Marcus spent the next few months tirelessly pushing Ms. Haber to publish as an undergraduate in his journal.  Eventually, Ms. Haber stopped resisting and agreed to write the piece Mr. Marcus requested.  Ms. Haber later learned that Mr. Marcus published Ms. Haber's article without submitting it to an academically respected level of review.  Mr. Marcus also made unilateral changes to Ms. Haber's writing without her consent, misrepresenting her opinion on controversial anthropological issues.

145.    Mr. Marcus continued to offer Ms. Haber academic opportunities on the basis that he believed she was an easy target.  For example, in an email exchange between Mr. Marcus and another professor in which they were discussing which students to staff on a research project, Mr. Marcus recommended Ms. Haber in part because she's "pretty and lots of fun as a drinking companion."

### G.    Mr. Marcus's Sexual Harassment Culminates in Violent Rape

146.    Thereafter, Mr. Marcus continued to prey on Ms. Haber.  Mr. Marcus often invited Ms. Haber to lunches, networking events and conferences.  While Mr. Marcus would sometimes maintain professionalism, he also continued to touch and proposition Ms. Haber without her consent.

147.    By way of example only, Mr. Marcus would offer to drive Ms. Haber home if she had been working late in The Swamp.  Often, when Mr. Marcus and Ms. Haber passed a motel, Mr. Marcus would tell her:  "**I wish I could take you into that motel and fuck you**."  On one occasion after a research meeting, Mr. Marcus walked Ms. Haber out of the building and told her "**I want to go up to your apartment with you and fuck you**."

148.    Mr. Marcus also continued to try to kiss Ms. Haber if they were alone together.  This happened on numerous occasions in The Swamp, in elevators at John Jay, in Mr. Marcus's

car and once outside John Jay's main building, where faculty and students could see.  Ms. Haber continually rebuffed Marcus's advances each and every time and made it unmistakably clear to him that she was not interested in him.

149.    In or around fall 2015, Ms. Haber and Ms. Cojocaru were in Mr. Marcus's office when he pulled out a bottle of whiskey and poured Ms. Haber and Ms. Cojocaru straight whiskey drinks.  Later that night, after Ms. Haber had been drinking, Ms. Cojocaru left the office to use the restroom.  Immediately after she left, Mr. Marcus locked the door and ordered Ms. Haber to get on the floor.

150.    Ms. Haber felt extremely intoxicated and did as she was told.  Mr. Marcus proceeded to slap Ms. Haber across the face, forcibly removed Ms. Haber's pants and underwear and performed oral sex on Ms. Haber without her consent.  Ms. Haber froze, unsure of how to stop Mr. Marcus or remove herself from the situation.  After a few minutes, Ms. Cojocaru thankfully returned and tried to get into the locked office, causing Mr. Marcus to stop, pull Ms. Haber's pants up and help her onto her seat and open his office door.

151.    On or around November 18, 2015, Ms. Haber attended an ASC Conference in Washington, D.C. with Mr. Marcus and Ms. Cojocaru.  Ms. Cojocaru had plans to meet a friend, and they invited Mr. Marcus and Ms. Haber to join them for dinner.  At dinner, Marcus ordered Ms. Haber copious amounts of alcohol, causing her to get extremely intoxicated.

152.    Ms. Haber wanted to leave the restaurant and go to her hotel so she could get some sleep before the conference the next morning.  However, Ms. Haber's belongings were at Mr. Marcus's apartment, so Ms. Haber went to his apartment to pick up her clothes so she could go back to her hotel.

153.    When she arrived at Mr. Marcus's apartment, she began to feel nauseous and asked to sit down.  Mr. Marcus suggested that Ms. Haber sleep there, and Ms. Haber agreed because she did not feel well.

154.    In the middle of the night, Ms. Haber awoke and ran to the bathroom believing she might vomit from the excessive alcohol.  She felt the room spinning, and returned to the bed hoping to fall back asleep.  A few minutes later, Ms. Haber felt Mr. Marcus next to her, rubbing his erect penis against her.  Mr. Marcus then rolled on top of Ms. Haber, crushing her beneath his bodyweight.

155.    Ms. Haber began to say "no" and that she was nauseous, but before she could even finish her sentence, Mr. Marcus said to her:  "**Claudia told me to punish you**."  Mr. Marcus then viciously hit Ms. Haber on both sides of her face.  Ms. Haber observed Mr. Marcus's demeanor completely switch; he looked cold, enraged and full of aggression. Mr. Marcus proceeded to bite Ms. Haber's breasts and nipples extremely hard, causing her excruciating pain.  Mr. Marcus then put his hands around her throat, choked her with both hands and forced himself inside her without warning.  He was not wearing a condom.  Mr. Marcus thrust approximately three or four times before ejaculating on Ms. Haber.

156.    Afterwards, he rolled off of Ms. Haber and walked to the bathroom to clean himself off, not saying a word.  Ms. Haber, in complete shock and terror, grabbed her things and rushed into a cab to go back to her and Ms. Cojocaru's hotel room.  Ms. Cojocaru noticed Ms. Haber was upset, but Ms. Haber said she did not want to discuss it.  Ms. Haber hoped that she could pretend the rape never happened.

157.    Mr. Marcus was likely emboldened by Ms. Haber's silence, and he continued to sexually harass her at every turn, trying to kiss her and telling her that he had a "crush" on her.

At the time, Ms. Haber believed that continuing to be around Mr. Marcus allowed her normalize the conduct and cope with the trauma of the rape.

158.    Unfortunately, Mr. Marcus seemed to realize that Ms. Haber continued to be vulnerable.  In Summer 2016, Ms. Haber was scheduled to go to lunch with Mr. Marcus to discuss their research.  On this day, however, Mr. Marcus told Ms. Haber to meet him back at his office.  Once there, Mr. Marcus began smoking marijuana, and pressured Ms. Haber to smoke with him.  The marijuana made Ms. Haber feel very intoxicated.

159.    After smoking, Mr. Marcus again ordered Ms. Haber to the floor, similar to something he had done to her on another occasion.  Ms. Haber felt paralyzed and compelled to comply, as she knew Mr. Marcus was capable of violence, particularly in a sexual scenario.  However, her physical reaction and body language made it extremely clear to Mr. Marcus that she did not want this sexual encounter.

160.    Mr. Marcus again forced intercourse upon Ms. Haber, again without a condom, and ejaculated inside of her.  Mr. Marcus left Ms. Haber there on the floor, refusing to acknowledge that he had just raped her.

**H.    John Jay Refuses to Listen to Ms. Haber and Ms. Cojocaru's Complaints**

161.    Beginning in 2015, Ms. Haber made attempts to complain to John Jay faculty and staff about Mr. Curtis and Mr. Marcus and the entire culture of sexism, misogyny, harassment and drugs in The Swamp.  Unfortunately, her complaints fell on deaf ears.

162.    Ms. Haber complained to Ms. Jackson.  Ms. Jackson listened to Ms. Haber's complaints and confided with Ms. Haber that she believed Mr. Marcus was a sexual predator.  Upon information and belief, Ms. Jackson did not escalate Ms. Haber's complaints.

163.     As Ms. Haber understands, Anne Lopes (then-Interim Provost and Senior Vice President of Academic Affairs), Daniel Stageman (then-Director of Research Operations) and Allison Pease (Associate to the Provost for Faculty and Professor) were also aware of Mr. Curtis's harassing behavior.  Upon information and belief, Ms. Lopes, Mr. Stageman and Ms. Pease all failed to escalate or address Mr. Curtis's harassment.

164.     Ms. Haber also complained to Ms. Byrne, both in Ms. Byrne's capacity as Head of the Honors Program and as Dean of Undergraduate Students.  In 2016, Ms. Haber and Ms. Cojocaru told Ms. Byrne, "**hey, you should look into what is going on with Ric [Curtis] and Anthony [Marcus]** . . ." and Ms. Byrne cut them off and said: "**Stop.  I don't want to hear it**." Ms. Haber and Ms. Cojocaru tried to continue the complaint, but Ms. Byrne *again* cut them off, and said "**I do not want to hear it**."

165.     Throughout her employment at John Jay, Ms. Byrne has been a mandatory reporter of sexual harassment.  Upon information and belief, Ms. Byrne was aware of the sexual misconduct and drug abuse committed by Mr. Curtis and Mr. Marcus, and refused to listen to Ms. Haber and Ms. Cojocaru in an effort to avoid addressing these widely-known issues.

166.     Moreover, Ms. Haber is also aware of other complaints that have been lodged against Mr. Curtis.  Mr. Curtis openly bragged about being the target of sexual harassment and gender discrimination complaints and described to Ms. Haber on more than one occasion how he "dodged another bullet."  Upon information and belief, many women have reported Mr. Curtis's unlawful behavior, and John Jay has failed to hold Mr. Curtis accountable.

### III. MS. COJOCARU AND MS. HABER FILE TITLE IX COMPLAINTS AND ARE SUBJECTED TO ADDITIONAL MISTREATMENT AND RETALIATION; JOHN JAY DEMONSTRATES THAT IT IS ONLY CONCERNED WITH PROTECTING ITSELF AND ITS PUBLIC IMAGE

167.    By May 2018, Ms. Cojocaru and Ms. Haber had finally put some distance (both physically and temporally) between themselves and The Swamp.  This distance provided them with the benefit of a more clarity on the gravity of the mistreatment they were subjected to.  As a result, they each filed complaints of discrimination with John Jay's Title IX office.

### A. John Jay's Investigation Into Ms. Cojocaru and Ms. Haber Complaints Is Fraught With Error, Partiality, Bias and Violations of CUNY's Own Policies

168.    After Ms. Cojocaru and Ms. Haber filed their initial complaints, John Jay retained an outside law firm, Riley Safer Holmes & Cancila LLP ("Riley Safer") to conduct a supposed "independent" and "impartial" investigation.  The lead investigator at Riley Safer was Ryan Poscablo, Esq.

169.    Throughout May and June of 2018, Ms. Cojocaru and Ms. Haber were each asked to sit for several interviews totaling numerous hours and required to answer questions about the sexual harassment they experienced in excruciating detail.

170.    Despite the obvious difficulty in telling a stranger, especially a man, about such horrific events, Ms. Cojocaru and Ms. Haber answered every question that was asked of them.  They also provided written statements detailing some of their experiences and provided copies of all relevant emails and text messages that were requested of them.

171.    During this time, Ms. Cojocaru and Ms. Haber did not know that they had rights under federal, state and local laws to pursue civil claims against CUNY and the professors who

sexually harassed them and they were also unaware of the rights afforded to them under CUNY's

Policy on Sexual Misconduct (the "Sexual Misconduct Policy").[6]

172.    Outrageously, John Jay and Riley Safer took advantage of Ms. Cojocaru and Ms.

Haber's ignorance of the Sexual Misconduct Policy.  For instance, pursuant to CUNY's Sexual

Misconduct Policy, complainants are entitled to be "**accompanied by an attorney or other**

**advisor of their choice, who may assist and advise the complainant or respondent**

**throughout the process including during all related meetings and hearings**."

173.    However, no one at John Jay or Riley Safer ever informed Ms. Cojocaru and Ms.

Haber that they had the right to legal representation at any point during the many hours of

difficult and emotionally straining interviews.  In fact, to the contrary, John Jay and Riley Safer

actively dissuaded them from seeking outside legal counsel in connection with the investigation.

174.    By way of example only, two attorneys at Riley Safer who were responsible for

handling the investigation told Ms. Cojocaru and Ms. Haber on more than one occasion that they

"**did not need any attorneys**," because their meetings were "**just [] fact finding interviews**."

Needless to say, as supposed "independent" investigators, it was not Riley Safer's place to

provide any advice – legal or otherwise – to Ms. Cojocaru and Ms. Haber.

175.    The investigators at Riley Safer again misled Ms. Cojocaru and Ms. Haber in

September 2018 when the press learned of their Title IX complaints, telling Ms. Cojocaru and

Ms. Haber "**you really do not need attorneys since this is not a legal matter**."  Again, that

---

[6]      Apparently, Ms. Cojocaru and Ms. Haber are not alone in this regard.  While CUNY
maintains such a policy document, students at John Jay are widely unaware and uniformed about
the contents of the Sexual Misconduct Policy.  During a John Jay town hall hosted by Ms. Mason
on May 9, 2019, several students spoke about the lack of awareness and communication
regarding rights afforded to students who are victims of sexual misconduct.

Riley Safer was purporting to provide advice to Ms. Cojocaru and Ms. Haber illustrates their failure to understand their role or place in the investigatory process.

176.    In addition to advising them not to retain attorneys, Mr. Poscablo also misrepresented his role to Ms. Haber early in the investigatory process.  During one conversation, Mr. Poscablo stated that his role was as follows: "Well like I said, I'm just here to support you."  As a supposed "independent" investigator, Riley Safer's role was not to "support" her, but to gather information and generate findings.  Ms. Haber believes that Mr. Poscablo misrepresented his role to secure her confidence and deter her from seeking legal counsel.

177.    Riley Safer also attempted to give Ms. Haber actual advice regarding how and with whom – other than Riley Safer – she should discuss her complaints.  Riley Safer attempted to deter Ms. Haber from speaking with the media, despite the fact that it was in no place to give her any advice on these matters at all.  However, by stating that he was "here to support" her and because Mr. Poscablo is an attorney, Ms. Haber was led to believe that he was providing her with this advice because it was in her best interest.  Of course, it was in John Jay's interest for Ms. Haber not to speak with the media and that was the reason for this direction.

178.    Eventually, Ms. Cojocaru and Ms. Haber sought and retained legal representation. However, Ms. Cojocaru and Ms. Haber would have done so far earlier had they been genuinely informed of their rights under CUNY's Sexual Misconduct Policy and/or if Riley Safer had not affirmatively deterred them from seeking outside legal advice.

179.    On or about November 8, 2018, Ms. Cojocaru and Ms. Haber informed John Jay's President – Ms. Karol Mason – that they were represented by legal counsel.  At the same time, Ms. Cojocaru and Ms. Haber – through their legal counsel – filed further and more extensive

complaints of sexual misconduct and stated their likely intention to pursue claims against John

Jay and/or CUNY in court under Title IX and other federal, state and local law.

180.    Apparently, John Jay and Riley Safer took issue with Ms. Cojocaru and Ms.

Haber's decision to retain counsel and pursue their rights under the law.  After that point, John

Jay and Riley Safer treated Ms. Cojocaru and Ms. Haber with even more derision and were

openly hostile towards them and their counsel throughout the investigatory process.

181.    By way of example only, on November 30, 2018, Riley Safer emailed Ms.

Cojocaru and Ms. Haber individually – without copying their counsel on the email – requesting

that they sit for yet additional interviews despite the numerous hours of questioning that had

already occurred.  In response, Ms. Cojocaru and Ms. Haber requested that their counsel be

copied on all communications going forward.

182.    Nonetheless, Riley Safer refused and continued to attempt to communicate with

Ms. Cojocaru and Ms. Haber directly without informing or copying their attorneys.  In effect,

Riley Safer was attempting to hinder Ms. Cojocaru and Ms. Haber's legal representation.

183.    On December 17, 2018, Riley Safer sent Ms. Cojocaru and Ms. Haber an email

accusing her of not responding to its November 30 request for further questioning (she had in

fact responded through counsel) and demanded that she personally respond within the next few

days or it would assume she "does not want to meet with [him] again and we will move forward

with the investigation."

184.    At that point, even though *seven* months had passed since Ms. Cojocaru's initial

complaint and she had been questioned several times for an aggregate of numerous hours, John

Jay's investigator demanded that Ms. Cojocaru tell them whether she could participate in

additional interviews in less than one week – an arbitrary deadline without explanation or justification – and insinuated that her failure to respond would be held against her.[7]

185.    Not only was John Jay's treatment improper and highly insensitive to sexual misconduct complainants, it was also disparate treatment relative to the accused professors. When Ms. Cojocaru asked Mr. Poscablo whether he had met with the professors, Mr. Poscablo told her that they were represented by lawyers, and that he was in contact with their lawyers, not with the professors directly.  Mr. Poscablo also added that the professors' lawyers were repeatedly delaying and rescheduling their meetings.

186.    Further demonstrating an attempt to hinder and deter Ms. Cojocaru and Ms. Haber's legal representation, Riley Safer refused to send their attorneys the relevant evidence and materials concerning the investigation.  In fact, Riley Safer refused to even forward emails and provide Ms. Cojocaru and Ms. Haber's counsel with the previous communications regarding the investigation – instead thrusted that burden on them.  Riley Safer treated the relationship as an "adversarial" relationship despite being a supposed impartial investigator.  This only further demonstrated Riley Safer's bias and a lack of impartiality in the process.

187.    CUNY policy explicitly required that Ms. Cojocaru and Ms. Haber be provided with the requested materials.  The Sexual Misconduct Policy states that "[w]henever an investigation takes place," the complainant has the right to "review documents and tangible evidence."  CUNY acted in violation of its own policies by refusing to provide these materials upon request.  Again, this further demonstrated that John Jay and Riley Safer were more concerned with protecting the school than providing the required fair and impartial process.

---

[7]    As would later become apparent, John Jay was nowhere near the end of the investigation at that point – further demonstrating that there was no genuine urgency at that stage.

188.    Further demonstrating the blatant lack of independence of Riley Safer, on May 7,

2019, John Jay held a fundraiser called the *Educating for Justice Gala*.  Despite the fact that the

investigation into Ms. Cojocaru and Ms. Haber's claims remained ongoing and incomplete,

members of Riley Safer – including Mr. Poscablo – attended the event and supported John Jay.

Upon information and belief, Riley Safer donated substantial funds to John Jay in connection

with this event and did so to further solidify its business relationship with John Jay and to help

ensure that John Jay continues to retain Riley Safer for future legal work.

189.    John Jay and Riley Safer's repeated improper conduct in the investigation made it

clear that there was no genuine effort to conduct a fair, unbiased and impartial investigation.  To

the contrary, Riley Safer's goal was simply to protect John Jay as much as possible – whether

that meant dissuading Ms. Cojocaru and Ms. Haber from retaining counsel or taking legal action,

providing advice to minimize publicity, interfering with their rights under the Sexual Misconduct

Policy, or otherwise.

**B.    Ms. Cojocaru and Ms. Haber File Formal Complaints Regarding John Jay's
Sham Investigatory Process; John Jay Refuses to Consider Their Concerns**

190.    Ms. Cojocaru and Ms. Haber were extremely distraught by the way John Jay and

Riley Safer were reviewing and investigating their complaints of sexual misconduct.  As such, on

several occasions Ms. Cojocaru and Ms. Haber raised their concerns to John Jay directly, but

nothing was done.

191.    On December 21, 2018, Ms. Cojocaru and Ms. Haber escalated their complaints

and concerns about John Jay and Riley Safer's investigation to Gabriela Leal, Esq. (John Jay's

Deputy Director of Compliance and Diversity), in an eight-page detailed letter.

192.    On January 4, 2019, two weeks after the complaint, Ms. Leal finally responded

and actually admitted that she "decline[d] to discuss the substance of [Ms. Cojocaru and Ms.

47

Haber's] letter," and demanded that Ms. Cojocaru and Ms. Haber contact Mr. Poscablo to set up another interview within the three business days.

193.    Ms. Cojocaru and Ms. Haber were completely dejected by John Jay's admission that it would not address their specific concerns.  Accordingly, Ms. Cojocaru and Ms. Haber requested that Ms. Leal direct them to the appropriate person to conduct a review the investigation itself and make a determination as to whether it was being conducted properly.  Ms. Leal directed them to contact Marjorie Singer, Esq. (Executive Counsel for John Jay).

194.    However, Ms. Singer was far from an independent or unbiased designee to review the investigation.  For example, on the "Office of Legal Counsel" page on John Jay's website, Ms. Singer's role is described as "to support the College, its students, staff and faculty so that quality and opportunity are maximized and <u>risk is minimized</u>."[8]  Ms. Singer's role at John Jay is not at all impartial, rather it is to reduce John Jay's legal exposure and avoid any potential liability.

195.    Moreover, during this time frame, Ms. Singer (along with CUNY's Senior Litigation Counsel, Hilary Klein, Esq.) represented John Jay in connection with ongoing negotiations aimed at resolving Ms. Cojocaru and Ms. Haber's potential civil claims.  As such, Ms. Singer was in no manner impartial.  To the contrary, Ms. Singer was acting in very much an adversarial capacity with respect to Ms. Cojocaru and Ms. Haber claims and attempting to minimize John Jay's legal and monetary exposure.

196.    Ms. Singer had a clear and undeniable conflict between, on the one hand, representing John Jay with respect to the potential resolution of civil claims and, on the other hand, reviewing and making a determination regarding the appropriateness of the investigation

---

[8]      Available at: https://www.jjay.cuny.edu/office-legal-counsel (emphasis added).

into Ms. Cojocaru and Ms. Haber's Title IX complaints.   If Ms. Singer found that the

investigatory process was improper, it would make John Jay even more vulnerable to legal

liability.

197.     However, with nowhere else to turn, on January 23, 2019, Ms. Cojocaru and Ms.

Haber – through their counsel – sent Ms. Singer a letter escalating their detailed complaints

regarding the major problems in the investigatory process.

198.     In their letter, Ms. Cojocaru and Ms. Haber pleaded to Ms. Singer to conduct an

impartial review of the investigation and address the inappropriate conduct committed by Riley

Safer – including but not limited to dissuading them from retaining counsel or taking legal

action, providing advice to minimize publicity, and interfering with their rights under the Sexual

Misconduct Policy.

199.     As expected, Ms. Singer failed to legitimately address their concerns.  Only six

days later, Ms. Singer responded with an extremely brief and conclusory email, stating:

> Based on my analysis of the facts, it is my conclusion that the
> investigation has been conducted impartially and in accordance
> with CUNY's policy. There are no grounds to find that the
> investigator is conflicted and no grounds to remove the
> investigator from this process.

Ms. Singer did not indicate what documents or materials she reviewed, who she interviewed or

what information she considered in coming to her quick and rote conclusion.

200.     Upon information and belief, Ms. Singer did not conduct any actual review of the

investigation or the specific concerns raised.  Had Ms. Singer actually investigated these matters,

she would have learned that there is objective documentary evidence and audio recordings

substantiating the complained about improper conduct in the investigation.

201.    On January 30, 2019, Ms. Cojocaru and Ms. Haber responded through their

counsel and stated:

> Your response only further confirms that Ms. Cojocaru and Ms.
> Haber have been and continue to be denied a fair and impartial
> investigation. It is clear you have not done any legitimate
> investigation or review of [the] complaints regarding the
> investigatory process. You have not explained any steps you have
> taken to review [the] very serious complaints of misconduct. You
> have not explained the basis on which you have determined that
> John Jay's investigation has been "conducted impartially in
> accordance with CUNY's policy." You have not explained why
> the extremely troubling allegations led you to the conclusion that
> there are "no grounds to find that the investigator is conflicted and
> no grounds to remove the investigator from this process." You
> have not provided any details as to whether any of the factual
> allegations [] have asserted have been substantiated,
> unsubstantiated or otherwise.
>
> In short, it appears as though the review of [the] complaints
> regarding the investigatory process has been nothing more than
> further a rubber-stamp of John Jay's clearly biased and improper
> investigation. Particularly given the current environment, we
> would have expected Ms. Cojocaru and Ms. Haber's complaints of
> misconduct to be taken seriously. Instead, this response only
> perpetuates the proposition and sends a message to all other CUNY
> students and employees that those who have the courage to raise
> sexual misconduct complaints will be further victimized by a
> process intended only protect the institution.

202.    Due to the fact that Ms. Cojocaru and Ms. Haber were being continually

victimized by John Jay's investigatory process, had been denied numerous rights under CUNY's

Sexual Misconduct Policy and were left without any avenue to seek redress, they declined to

appear for further interviews with Riley Safer.

203.    In or around the same time, CUNY also began investigating ancillary complaints

of misconduct that stemmed from Ms. Cojocaru and Ms. Haber's May 2018 complaints – in

particular, certain individuals filed retaliatory complaints against Ms. Cojocaru. These

investigations were carried out not by Riley Safer, but by John Jay and CUNY's own in-house

employees including Michael Ferrandino (Director of Operations for CUNY), Christopher

Carozza, Esq. (Chief Diversity Officer and Title IX Coordinator for CUNY's LaGuardia

Community College) and Donald Gray (John Jay's Labor Designee and Ethics Officer).

204.    These ancillary investigations were also conducted in an arbitrary and *ad hoc*

manner that failed to follow CUNY's policies let alone basic fairness.  By way of example only,

Mr. Carozza refused to provide Ms. Cojocaru with any documents related to his investigation,

even though CUNY's policy explicitly stated that she was entitled to review these documents in

connection with the investigation.  Ms. Cojocaru had to issue several complaints to Mr. Carozza,

and even escalate her complaints to Marjorie Singer.  Only weeks later, Mr. Carozza finally

permitted Ms. Cojocaru to review the relevant documents as was her right.

205.    Also by way of example only, Mr. Ferrandino refused to provide Ms. Cojocaru

with either a statement of allegations at issue (or the documents and evidence related to the

complaint Mr. Ferrandino was investigating) – essentially keeping her completely in the dark.

CUNY's policy provides with Ms. Cojocaru the following express right:

> [T]o receive reasonable advance written or electronic notice of any
> meeting they are required to or eligible to attend, of the specific
> rule or law alleged to have been violated and in what manner.

206.    Mr. Ferrandino's refusal was clearly in contravention of CUNY's policy and a

distinct deviation from its practices and was wholly improper.

207.    Despite refusing to provide this information, Mr. Ferrandino expected Ms.

Cojocaru to sit for an interview and answer questions.  Ms. Cojocaru told Mr. Ferrandino that

she would not appear for an interview until she had the opportunity to review the relevant

documents and information.  Mr. Ferrandino accused Ms. Cojocaru of (somehow) misreading the

policy, and intimated that she was being uncooperative.

208.     Ms. Cojocaru had to then escalate her complaints to Ms. Singer and ask that she intervene and require Mr. Ferrandino provide a written summary of the allegations.  Ms. Singer, who could not refuse the clear text of the CUNY policy, admitted that Ms. Cojocaru was entitled to this information and that it should not be withheld by Mr. Ferrandino.

209.     On March 30, 2019, Ms. Cojocaru and Ms. Haber – through counsel – sent yet another detailed complaint to CUNY regarding the investigatory process.  This communication again detailed the myriad manners in which Ms. Cojocaru and Ms. Haber had been mistreated and retaliated against with respect to the investigations being conducted by Riley Safer and by John Jay directly.  Ms. Cojocaru and Ms. Haber put CUNY on notice that they believed this conduct was retaliatory.

**C.     John Jay Discriminates Against Ms. Cojocaru On Account of Her Request for Reasonable Accommodations**

210.     Among the most troubling aspects of John Jay's investigatory process was the fact that Ms. Cojocaru's emotional state and request for reasonable accommodations was expressly held against her.

211.     Ms. Cojocaru, who was already extremely distraught by the sexual assault and harassment she experienced at John Jay, felt only further victimized by the Jay Jay's ongoing harassment and retaliation in response to her complaints.

212.     Accordingly, Ms. Cojocaru's treating psychiatrist recommended that Ms. Cojocaru not sit for any further in-person interviews in the ongoing ancillary investigations, as that it was in his opinion that it would be detrimental to Ms. Cojocaru's wellbeing.  Ms. Cojocaru's psychiatrist recommended that alternative means of communication, including written interview questions and responses, would be in her best interest given her condition.

213.    As such, Ms. Cojocaru submitted a letter to that effect from her psychiatrist and requested that John Jay reasonably accommodate her by requesting information as was needed in writing, instead of in person.  Mr. Ferrandino told Ms. Cojocaru that he would accommodate her request.  What he did not share was that he would penalize her for being unable to appear for the interview in person.

214.    Mr. Ferrandino asked Ms. Cojocaru only one written question, which she promptly responded.  Mr. Ferrandino asked no follow-up questions and did not request any additional information.  Shockingly, Mr. Ferrandino disregarded Ms. Cojocaru's response and made a finding against Ms. Cojocaru.

215.    On March 30, 2019, Ms. Cojocaru, through her counsel, made a formal written complaint to Ms. Singer and Ms. Klein, alleging that that John Jay's conclusion was further evidence that the ongoing investigations lacked legitimacy and were being conducted without any basic level of due process.

216.    On April 9, 2019, Ms. Cojocaru's counsel held a telephone conference with Ms. Klein, Ms. Singer and Eric Doering, Esq. (John Jay Associate Counsel) to discuss the results of Mr. Ferrandino's findings and Ms. Cojocaru's complaint about the lack of due process. Incredibly, on that call, Ms. Klein, Senior Litigation Counsel for CUNY, admitted that:

> **The role of the investigator is to make credibility determinations. [Ms. Cojocaru] put herself at a disadvantage by not appearing for the interview.**

217.    Ms. Klein's statement made it abundantly clear that John Jay did not actually accommodate Ms. Cojocaru's medical need, but instead interpreted Ms. Cojocaru's medical condition as some sort of voluntary refusal to engage in the investigatory process.

218.    This constitutes blatant discrimination on account of Ms. Cojocaru's medical condition and/or disability for which she had requested an accommodation.

### D.    John Jay's President Karol Mason Misrepresents to the Public that the Investigation is Proceeding in a Fair and Thorough Manner

219.    Despite being on actual notice – on numerous occasions – that the victims, Ms. Cojocaru and Ms. Haber, viewed the entire investigatory process as improper, unprofessional, bias, partial and retaliatory, that it lacked procedural safeguards and that they were being further victimized during the investigatory process, John Jay misrepresented to the public that the investigation was proceeding in an appropriate manner.

220.    On March 27, 2019, Ms. Karol Mason, sent a mass email to the entire John Jay community attempting to portray the institution as one that is sensitive to the needs of its students and faculty.  Ms. Mason directly addressed the investigation into the complaints filed by Ms. Cojocaru and Ms. Haber, stating "the investigation is still active and progressing in a way that is thorough and fair."

221.    Of course, when Ms. Mason made this statement to the public, she was well aware that this was the opposite of how Ms. Cojocaru and Ms. Haber would describe the investigation.  But, Ms. Mason withheld this fact from the public and only described the investigation on terms that were beneficial to her and John Jay.

222.    This further shows that John Jay's entire focus and concern in the investigation was at all times the reputation and image of John Jay, and not ensuring a fair, impartial and appropriate investigation to adequately protect Ms. Cojocaru and Ms. Haber's rights.

E. **Despite the Biased and Improper Investigation, John Jay Substantiates Many of Ms. Cojocaru and Ms. Haber's Allegations of Sexual Misconduct**

223.    On May 15, 2019, one year after Ms. Cojocaru and Ms. Haber filed their initial complaints, John Jay released the results of its investigation.

224.    John Jay did not share any of the rationale or basis for its findings, and maintains that this information is confidential, even to Ms. Cojocaru and Ms. Haber.

225.    John Jay also did not provide Ms. Cojocaru or Ms. Haber with the documents or witness statements that were gathered and relied upon over the course of the investigation.

226.    In its findings, John Jay substantiated many of Ms. Cojocaru and Ms. Haber's complaints of sexual misconduct.

227.    By way of example only, John Jay substantiated Ms. Cojocaru's complaints that:

- From approximately 2015 to 2017, Mr. Marcus encouraged and/or perpetuated an unprofessional and sexually inappropriate environment that demeaned women, encouraged non-academic sexually-charged discussions and the regular use of alcohol and other substances while on campus, and engaged in inappropriate and unprofessional physical contact with John Jay community members;

- During the period from approximately 2014 to 2018, Mr. Curtis encouraged non-academic sexually-charged discussions and the regular use of alcohol and other substances and engaged in inappropriate and unprofessional physical contact;

- During the period from approximately 2015 to 2017, Mr. Spunt fostered an inappropriate and unprofessional environment in the College, encouraged non-academic sexually-charged discussions and the regular use of alcohol and other substances on campus and engaged in other inappropriate behavior;

- In or around 2017, in Mr. Spunt's office, Mr. Spunt made a comment of a sexual nature, suggesting that Ms. Cojocaru should show Ms. Cojocaru's gratitude to Mr. Curtis by sitting on Mr. Curtis's lap; and

- Mr. Spunt lifted his shirt and exposed himself to Ms. Cojocaru by showing Ms. Cojocaru his scar.

228.  Also by way of example only, John Jay substantiated Ms. Haber's complaints that:

- From 2015-2017, Mr. Marcus encouraged non-academic sexually-charged discussions and the regular use of alcohol and other substances;

- At the 2014 Sociology Department Holiday Party, Mr. Marcus engaged with Ms. Haber in an inappropriate conversation of a sexual nature and made inappropriate physical contact with Ms. Haber;

- In or around mid-February 2015, at a restaurant near John Jay's campus, Mr. Marcus engaged Ms. Haber in an inappropriate conversation of sexual nature;

- On one occasion after March 2015 and prior to November 2015, Marcus, a professor, had a sexual encounter with Ms. Haber in his office while Ms. Haber was a student;

- On numerous occasions between February 2015 and November 2015, Mr. Marcus directed sexual advances and/or sexual comments as well as ethnic and/or religious comments toward Ms. Haber;

- On or about November 18 and 19, 2015 in Washington, D.C., Mr. Marcus, a professor, had a sexual encounter with Ms. Haber while Ms. Haber was a student;

- During the period from 2014 to 2017, Mr. Curtis encouraged non-academic sexually-charged discussions and the regular use of alcohol and other substances;

- On or around October 29, 2014, Mr. Curtis showed Ms. Haber videos of a condom being placed on a black plastic penis;

- On or around October 29, 2014, Mr. Curtis showed Ms. Haber a video of him working out shirtless;

- On or about August 14, 2015, Mr. Curtis sent Ms. Haber an email offering to buy Ms. Haber a black vibrator and encouraged Ms.

Haber not to report an incident of sexual harassment involving another faculty member;

- In 2015 and 2016, Mr. Curtis encouraged Ms. Haber to have sex with a professor at another school;

- On or around January 29, 2015, Mr. Curtis suggested that Ms. Haber and Ms. Cojocaru have three-way sexual activity with Mr. Marcus in his office at John Jay College;

- In or around September 2016, Ms. Curtis sent Ms. Haber a text message of himself without a shirt, stating, "Me and Leo miss you.";

- From Fall 2015 to 2017, both on and off John Jay's College campus, Mr. Dominguez engaged in unprofessional and inappropriate behavior toward Ms. Haber in that Mr. Dominguez engaged Ms. Haber in sexual conversations, made unwanted commentary of sexual nature and directed unwanted sexual advances toward Ms. Haber; and

- On one occasion in 2017, Dominguez subjected Ms. Haber, a student, to sexual touching by placing his hands on Ms. Haber's vagina and on Ms. Haber's buttocks.

229.   After concluding the investigation, Ms. Mason sent an email to the entire John Jay community announcing that the professors' conduct was "unprofessional" and "unacceptable," and that John Jay would initiate disciplinary proceedings seeking to terminate the professors.

230.   Unfortunately, John Jay substantiating many of the allegations brought forth by Ms. Cojocaru and Ms. Haber cannot undo the gross sexual misconduct and assault committed by their own professors and mentors at John Jay, and the painful memories John Jay forced them to relive each and every day throughout the year-long, highly prejudiced investigation conducted by biased and unqualified investigators.

231.   Finally, upon information and belief, John Jay intentionally released the results of the investigation at the end of the College's regular school year, not because that is when the investigation just happened to conclude; rather, it was planned and designed tactic to minimize

the public backlash when Ms. Cojocaru and Ms. Haber commenced this action detailing the

myriad ways in which John Jay's policies and practices are wholly inadequate to protect those

who raise complaints of sexual misconduct.

## FIRST CAUSE OF ACTION
### (Violations of Title IX of the Education Amendments Act of 1972,
### 20 U.S.C. § 1681 *et seq.*)
### *Against Defendant CUNY*

232.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as

contained in each of the preceding paragraphs as if fully set forth herein.

233.    Title IX of the Education Amendments Act of 1972 states, "No person in the

United States shall on the basis of sex, be … subject to discrimination under any education

program or activity receiving Federal financial assistance."

234.    By the above described conduct, Plaintiffs were discriminated against on the basis

of their sex at Defendant CUNY, including but not limited to by sexual misconduct, sexual

harassment and sexual assaults by Defendants Curtis, Marcus, Dominguez and Spunt.

235.    By the above described conduct, Defendant CUNY was on notice of the

discriminatory conduct engaged in by faculty at John Jay.  Defendant CUNY failed to carry out

its duties and obligations pursuant to Title IX to investigate and take corrective action.

236.    By the above described conduct, Defendant CUNY allowed and fostered an

educational environment in which discriminatory and harassing practices that were, and continue

to be, sufficiently severe or pervasive to create an environment that is both subjectively and

objectively hostile, abusive and retaliatory.

237.    By the above described conduct, Defendant CUNY tolerated, condoned, ratified

and/or engaged in the sexually abusive educational environment, or, in the alternative, knew, or

should have known, of its existence, yet failed to conduct proper investigations and failed to take remedial action.

238.    By reason of the continuous and ongoing nature of the above-described sexual assault, sexual abuse, sexual harassment and sexual discrimination conduct, Plaintiffs are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

239.    As a direct and proximate result of Defendant CUNY's unlawful actions or inactions, Plaintiffs have suffered, and will continue to suffer, harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

240.    Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs and other appropriate relief.

## SECOND CAUSE OF ACTION
**(Retaliation in Violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq*)**
***Against Defendant CUNY***

241.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

242.    By the above described conduct, Defendant CUNY has retaliated against Plaintiffs in violation of Title IX by, *inter alia*, failing to properly investigate their claims of discrimination and sexual assault in retaliation of their protected activity and by instigating retaliatory investigation practices.

243.    As a direct and proximate result of Defendant CUNY's unlawful conduct in violation of Title IX, Plaintiffs have suffered, and continue to suffer, harm for which they are entitled to an award of damages to the greatest extent permitted by law, including, but not limited

to, monetary and/or economic harm, for which they are entitled to an award of monetary

damages.

244.    As a direct and proximate result of Defendant CUNY's unlawful actions,

Plaintiffs have suffered, and will continue to suffer, harm, including, but not limited to, loss of

future educational and employment opportunities, humiliation, embarrassment, reputational

harm, emotional and physical distress, mental anguish and other economic damages and non-

economic damages.

245.    Plaintiffs are entitled to all legal and equitable remedies available for violations of

Title IX, including compensatory damages, attorneys' fees and costs and other appropriate relief.

**THIRD CAUSE OF ACTION**
**(Violations of the Equal Protection Clause of the Fourteenth Amendment,**
**enforceable under 42 U.S.C. § 1983)**
***Against Defendant CUNY***

246.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as

contained in each of the preceding paragraphs as if fully set forth herein.

247.    The Fourteenth Amendment to the United States Constitution, enforceable through

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress …

248.    Under the Equal Protection Clause, discrimination based on sex is presumptively

unconstitutional and subject to heightened scrutiny.

249.    By the above described conduct,  Defendant CUNY's conduct endangered

Plaintiffs' safety, bodily integrity, privacy, security and well-being, and deprived Plaintiffs of their

right to equal dignity, liberty and equal protection of the laws.

250.    By the above described conduct, Defendant CUNY, acting under color of state

law, deprived Plaintiffs of their constitutional rights to an educational environment free from

sexual discrimination.

251.    Defendant CUNY's conduct was intentional, malicious or deliberately indifferent

to the Plaintiffs' constitutional rights.

252.    As a direct and proximate result of Defendant CUNY's conduct, Plaintiffs have

suffered, and continue to suffer, harm for which they are entitled to recover damages, including

compensatory damages, attorneys' fees and costs,  punitive damages and injunctive or

declaratory relief.

## FOURTH CAUSE OF ACTION
### (Gender Discrimination in Violation of the NYSHRL)
### *Against Defendant CUNY*

253.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as

contained in each of the preceding paragraphs as if fully set forth herein.

254.    By the above described conduct, Defendant CUNY subjected Plaintiffs to

discrimination on the basis of their sex, in violation of the NYSHRL.  Defendant CUNY

discriminated against Plaintiffs on the basis of their sex, and through its acts and failures to act,

ratified and fostered an educational and/or employment environment that allowed John Jay

faculty to engage in sexual misconduct, sexual harassment and sexual assaults.

255.    As a result, Plaintiffs were denied the opportunity to obtain an educational

environment and/or employment environment free from discrimination, and otherwise were

denied the same terms and conditions of education available to other students who were not subjected to such treatment.

256.    As a direct and proximate result of Defendant CUNY's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiffs have suffered, and continue to suffer, monetary and emotional harm for which they are entitled to an award of damages.

### FIFTH CAUSE OF ACTION
**(Aiding and Abetting Gender Discrimination in Violation of the NYSHRL)**
***Against Defendants Curtis, Marcus, Dominguez and Spunt***

257.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

258.    By the above described conduct, Defendants Curtis, Marcus, Dominguez and Spunt knowingly or recklessly aided and abetted, and directly participated in, the unlawful discrimination to which Plaintiffs were subjected in violation of the NYSHRL.

259.    As a direct and proximate result of Defendant Curtis, Marcus, Dominguez and Spunt's unlawful discriminatory conduct and harassment in violation of the NYSHRL, Plaintiffs have suffered, and continue to suffer, monetary and emotional harm for which they is entitled to an award of damages.

### SIXTH CAUSE OF ACTION
**(Retaliation in Violation of the NYSHRL)**
***Against Defendant CUNY***

260.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

261.    By the above described conduct, Defendant CUNY has retaliated against Plaintiffs in violation of the NYSHRL by, inter alia, failing to properly investigate their claims of

discrimination and sexual assault in retaliation of their protected activity and by instigating retaliatory investigation practices.

262.   As a direct and proximate result of Defendant CUNY's unlawful conduct in violation of the NYSHRL, Plaintiffs have suffered, and continue to suffer, harm for which they are entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, monetary and/or economic harm, for which they are entitled to an award of monetary damages.

263.   As a direct and proximate result of Defendant CUNY's unlawful actions, Plaintiffs have suffered, and will continue to suffer, harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

264.   Plaintiffs are entitled to all legal and equitable remedies available for violations of the NYSHRL, including compensatory damages, attorneys' fees and costs and other appropriate relief.

**SEVENTH CAUSE OF ACTION**
**(Gender Discrimination in Violation of the NYCHRL)**
***Against Defendant CUNY***

265.   Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

266.   By the above described conduct, Defendant CUNY subjected Plaintiffs to discrimination on the basis of their sex, in violation of the NYCHRL.  Defendant CUNY discriminated against Plaintiffs on the basis of their sex, and through its acts and failures to act,

ratified and fostered an educational and/or employment environment that allowed John Jay faculty to engage in sexual misconduct, sexual harassment and sexual assaults.

267.    As a result, Plaintiffs were denied the opportunity to obtain an educational environment and/or employment environment free from discrimination, and otherwise were denied the same terms and conditions of education available to other students who were not subjected to such treatment.

268.    As a direct and proximate result of Defendant CUNY's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and emotional harm for which they are entitled to an award of damages.

269.    Defendant CUNY's unlawful discriminatory actions constitute malicious, willful and wanton violations of NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Aiding and Abetting in Gender Discrimination in Violation of the NYCHRL)
### *Against Defendants Curtis, Marcus, Dominguez and Spunt*

270.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

271.    By the actions described above, Defendants Curtis, Marcus, Dominguez and Spunt knowingly or recklessly aided and abetted, and directly participated in, the unlawful discrimination to which Plaintiffs were subjected in violation of the NYCHRL.

272.    As a direct and proximate result of Defendants Curtis, Marcus, Dominguez and Spunt's unlawful discriminatory conduct and harassment in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and emotional harm for which they are entitled to an award of damages.

273.     Defendants Curtis, Marcus, Dominguez and Spunt's unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

### NINTH CAUSE OF ACTION
**(Retaliation in Violation of the NYCHRL)**
*Against Defendant CUNY*

274.     Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

275.     By the above described conduct, Defendant CUNY has retaliated against Plaintiffs in violation of the NYCHRL by, *inter alia*, failing to properly investigate their claims of discrimination and sexual assault in retaliation of their protected activity and by instigating retaliatory investigation practices.

276.     As a direct and proximate result of Defendant CUNY's unlawful conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, harm for which they are entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, monetary and/or economic harm, for which they are entitled to an award of monetary damages.

277.     As a direct and proximate result of Defendant CUNY's  unlawful actions, Plaintiffs have suffered, and will continue to suffer, harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

278.    Plaintiffs are entitled to all legal and equitable remedies available for violations of the NYCHRL, including compensatory damages, attorneys' fees and costs and other appropriate relief.

## TENTH CAUSE OF ACTION
### (Disability Discrimination in Violation of the NYSHRL)
### *Against Defendant CUNY*

279.    Plaintiff Cojocaru hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

280.    By the actions described above, including Defendant CUNY discriminated against Plaintiff Cojocaru on the basis of her disability and/or perceived disability in violation of the NYSHRL.

281.    As a direct and proximate result of Defendant CUNY's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff Cojocaru has suffered, and continue to suffer, monetary and emotional harm for which she is entitled to an award of damages.

## ELEVENTH CAUSE OF ACTION
### (Disability Discrimination in Violation of the NYCHRL)
### *Against Defendant CUNY*

282.    Plaintiff Cojocaru hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

283.    By the actions described above, including Defendant CUNY discriminated against Plaintiff Cojocaru on the basis of her disability and/or perceived disability in violation of the NYCHRL.

284.    As a direct and proximate result of Defendant CUNY's unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff Cojocaru has suffered and continues to suffer

harm for which she is entitled to an award of damages, to the greatest extent permitted by law, in addition to reasonable attorneys' fees and costs.

285.    Defendant CUNY's unlawful and discriminatory actions constitute knowing, malicious, willful, wanton and reckless violations of the NYCHRL for which Plaintiff Cojocaru is entitled to an award of punitive damages.

**TWELVTH CAUSE OF ACTION**
**(Violations of the GMVA)**
***Against Defendants Curtis, Marcus and Dominguez***

286.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

287.    By the actions described above, Plaintiffs were subjected to sexual assault, sexual battery, sexual violence and unwanted sexual touching by Defendants Curtis, Marcus and Dominguez.   Defendants Curtis, Marcus and Dominguez targeted Plaintiffs because they are women in violation of the GMVA.  The sexual assaults of Plaintiffs constitute a "crime of violence" against Plaintiffs motivated in whole or part due to their gender.

288.    As a direct and proximate result of the aforementioned gender-motivated violence, Plaintiffs have sustained, and will continue to sustain, monetary damages, physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation, entitling them to an award of compensatory damages.

289.    Under the GMVA, Plaintiffs are also entitled to an award of punitive damages and an award of attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants for the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.      An order that Defendants engage in injunctive measures aimed at remedying the unlawful conduct described herein so that other women will not be subject to the same unlawful conduct;

C.      An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiffs for all monetary and/or economic damages;

D.      An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiffs' emotional distress;

E.      An award of punitive damages in an amount to be determined at trial;

F.      Prejudgment interest on all amounts due;

G.      An award of Plaintiffs' reasonable attorneys' fees and costs; and

H.      Such other and further relief as the Court may deem just and proper.

Dated: June 10, 2019
     New York, New York

Respectfully submitted,

**WIGDOR LLP**

By:                     

    Douglas H. Wigdor
    David E. Gottlieb
    Jeanne M. Christensen
    Hilary J. Orzick

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845
dwigdor@wigdorlaw.com
dgottlieb@wigdorlaw.com
jchristensen@wigdorlaw.com
horzick@wigdorlaw.com

*Counsel for Plaintiffs*